2005 VT 44

# Ted Gladstone and Alexandra Gladstone v. Stuart Cinemas, Inc. and Melvin Stuart

[878 A.2d 214]

No. 03-298

Present: Amestoy, C.J.,[1] Dooley, Johnson, Skoglund and Reiber, JJ.

Opinion Filed March 25, 2005

---

[1] Chief Justice Amestoy sat for oral argument but did not participate in this decision.

*Stephen L. Saltonstall* of *Barr Sternberg Moss Lawrence Silver & Saltonstall, P.C.*, Bennington, for Plaintiffs-Appellants.

*Lon T. McClintock* of *Jacobs, McClintock & Scanlon, LPC*, Bennington, for Defendants-Appellees.

¶ 1. **Dooley, J.** In this corporate successor liability case, plaintiffs Ted and Alexandra Gladstone, who are attempting to collect an $89,709.58 judgment rendered in a prior action against Bennington Cinemas, Inc. (BCI) from defendants Stuart Cinemas, Inc. (SCI) and Melvin Stuart, appeal an order from the trial court granting defendants' motion for a judgment on partial findings pursuant to V.R.C.P. 52(c). The court concluded that the evidence presented at trial did not establish defendants' liability for the previously entered judgment. Plaintiffs contend the court erred in granting defendants' motion because the evidence presented at trial demonstrates that under three

common law theories of corporate successor liability — de facto merger, mere continuation and continuing enterprise — SCI is liable for the judgment. We reverse and remand.

¶ 2. Plaintiffs own a shopping plaza in Bennington. One of the commercial spaces in the plaza is a three-screen movie theater. In 1988, Stuart and his wife moved from Connecticut to Vermont to acquire a movie theater business. At this time, Green Mountain Cinemas, Inc., which operated the three-screen theater in plaintiffs' plaza, was selling its assets. The lease for the theater space between Green Mountain Cinemas, Inc. and plaintiffs, and running until June 30, 1998, was included as one of these assets. Melvin Stuart formed BCI to purchase the assets, making himself and his wife sole shareholders, directors and officers. BCI then operated the theater, and the corporation met its debt obligations, including rent due to plaintiffs, in a timely fashion.

¶ 3. BCI's movie theater was the only one operating in Bennington. During 1991 and 1992, Stuart received warnings from acquaintances in the movie distribution business that competitors were beginning to look at Bennington as a location to open a multiplex movie theater. Concerned that BCI would not survive if a competitor entered the market, Stuart investigated the possibility of expanding the three-screen cinema. With plaintiffs' consent, Stuart employed an architect and a contractor to propose a design and estimate the cost of expanding plaintiffs' plaza to accommodate a multiplex movie theater. Through BCI, Stuart applied to several banks for financing, but only Vermont National Bank (VNB) responded favorably. Shortly before BCI was approved for the loan, Stuart contacted Mr. Gladstone to inform him that VNB was interested in financing the expansion. Mr. Gladstone responded that he had received information that led him to believe that BCI would not be approved for the loan and he had rented the space proposed for the expansion to another tenant.

¶ 4. Because he could no longer expand his business in plantiffs' plaza, Stuart began to consider other options. Eventually, he decided that the best option was to purchase and renovate an existing property in Bennington on Route 67A. In 1994 and 1995, Stuart applied to VNB for financing for this project. VNB's commercial loan officer approved a business plan, under which the Stuarts would form a new corporation, separate from BCI, to run the multiplex theater. The business plan also provided that the three-screen theater would continue to operate after the multiplex opened if the business remained profitable.

VNB approved a financing package for the multiplex theater which included a $900,000[2] construction loan which was to mature in six months. At maturity, the construction loan would convert to a $400,000 commercial loan secured by the real estate and business assets, subordinated to a $500,000 commercial loan with a Small Business Administration (SBA) guaranty. Under the terms of the package, pending the formation of a new corporate entity, VNB required the Stuarts and BCI to pledge as borrowers on the construction loan. With financing in place, the Stuarts purchased the property on Route 67A on February 27, 1995. No funds from BCI were used in this purchase.

¶ 5. On March 3, 1995, the Stuarts incorporated SCI to operate the multiplex theater. As with BCI, Mr. and Mrs. Stuart were the sole shareholders, directors and officers of the new corporation. Despite having identical shareholders, officers, and directors, BCI and SCI maintained separate financial records, and BCI paid none of SCI's start up costs. The record indicates that BCI's involvement in the multiplex transaction was limited to being a listed borrower on the construction loan which was discharged on September 25, 1995 when, according to the terms of the financing package, the $400,000 commercial loan and $500,000 SBA backed loan were issued. BCI was not listed as borrower for either of these two loans.

¶ 6. SCI opened the multiplex theater in June 1995. During the following month, BCI's three-screen theater remained open, but, under direction from distributors, movies were shifted from the three-screen theater to the multiplex, leaving BCI's theater able to show only one movie. During July, several of BCI's employees were laid off and hired by SCI, and Stuart removed projectors and seats from the BCI theater and installed them in the SCI theater. Also during this month, the two theaters shared the same phone number.

¶ 7. BCI did not pay plantiffs rent for July 1995 and ceased operations the next month. Approximately two years later, plaintiffs sued BCI for back rent owed on the lease that BCI had assumed. The trial court found that BCI, as the assignee of the lease, was liable to plaintiffs for the unpaid rent. To date, BCI has not paid any portion of the ensuing judgment.

¶ 8. In an attempt to recover the judgment amount, plaintiffs filed in the original case a motion for a writ of execution against Stuart and SCI. The court denied the motion because SCI and Stuart were not

---

[2] This construction loan was later increased to $950,000.

parties to the action. Following this denial, plaintiffs initiated this action against Stuart and SCI. Plaintiffs advanced several theories of liability under which they could recover from parties with whom they were not in contractual privity under the lease. Each of the theories advanced below, like those advanced here, involved disregarding BCI's corporate form in order to impose liability on either Stuart or SCI, thereby making one or both of those parties responsible for BCI's debts. In the trial court, plaintiffs vigorously pursued the theory that the facts warranted the court piercing the corporate veil and imposing liability on Stuart individually. In the alternative, plaintiffs argued that under three subsets of the doctrine of successor liability — de facto merger, the mere continuation, and the fraudulent transaction theory — SCI should be liable for BCI's debts.

¶ 9. The court, in a bench trial, heard testimony over three days. At the conclusion of plaintiffs' case, defendants moved for entry of a judgment on partial findings under V.R.C.P. 52(c). Rule 52(c), which is virtually identical to Federal Rule 52(c), provides:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law . . . whether or not requested by a party.

In ruling on a 52(c) motion "the court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." 9A C. Wright & A. Miller, Federal Practice and Procedure 2d § 2573.1, at 498-99 (1995). In this case, the court concluded that the evidence did not establish liability on the part of SCI or Stuart and granted defendants' motion with respect to all of plaintiffs' theories of liability. Plaintiffs appeal this ruling, but not in its entirety. Plaintiffs do not appeal the court's refusal to pierce the corporate veil, nor its finding that there was no fraudulent transaction, but do contend that the court erred in finding that there was no de facto merger between BCI and SCI and that SCI was not a mere continuation of BCI. Plaintiffs also argue here, but did not argue below, that SCI should be liable under the continuing enterprise theory of successor liability.

¶ 10. We have not previously considered an appeal from a Rule 52(c) ruling. Rule 52(c) was added to bring the Vermont Rules into conformity with the Federal Rules. The Reporter's Notes explain that the rule was added to parallel Rule 50, Judgment as a Matter of Law in Actions Tried by a Jury, and replaced the part of Rule 41(b)(2) that "authorized dismissal when a plaintiff had failed to carry an essential burden of proof." Both parties agree that when considering a Rule 52(c) judgment we should review the trial court's conclusions of law de novo, and its underlying factual findings for clear error. This standard of review is in conformity with the federal courts' standard. See, e.g., *Mullin v. Town of Fairhaven*, 284 F.3d 31, 36-37 (1st Cir. 2002); *Dubner v. City & County of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001); *Samson v. Apollo Res., Inc.*, 242 F.3d 629, 632-33 (5th Cir. 2001); *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000). It is consistent with our decisions reviewing motions granted pursuant to 52(c)'s predecessor, Rule 41(b)(2). See *New England Educ. Training Serv., Inc. v. Silver St. P'ship*, 156 Vt. 604, 611, 595 A.2d 1341, 1344-45 (1991).

¶ 11. While plaintiffs accept this deferential standard of review, they argue that the trial court "relied upon an erroneous view of the applicable law," and that this Court should consider whether, at trial, plaintiffs presented sufficient evidence to establish a prima facie showing of successor liability. Plaintiffs contend that if they established a prima facie case they should survive defendants' motion for a judgment on partial findings. This is not the standard under Rule 52(c). Wright and Miller explain that "[t]he trial judge is not to . . . concern itself with whether the nonmovant has made out a prima facie case." Wright & Miller, *supra*, § 2573.1, at 497-98. Instead the judge acts as the trier of fact, weighing the evidence and determining whether the nonmovant has established a right to relief. See *Stearns v. Beckman Instruments, Inc.*, 737 F.2d 1565, 1568 (Fed. Cir. 1984) (discussing Rule 41(b) which was succeeded by 52(c) and explaining that judge weighs and passes on evidence presented). Unlike the procedure for summary judgment, under Rule 52(c) the judge does not have to consider the evidence in the light most favorable to the non-moving party. See *New England Educ. Training Serv., Inc.*, 156 Vt. at 611, 595 A.2d at 1344-45; *Geddes v. Northwest Mo. State Univ.*, 49 F.3d 426, 429 n.7 (8th Cir. 1995); *United States v. Davis*, 20 F. Supp. 2d 326, 331 (D.R.I. 1998). Therefore, if the judge determines, after weighing the evidence, that the plaintiff has not established a claim for relief, the motion for a judgment on partial findings may be granted even if the plaintiff has established a prima facie case. See *Stearns*, 737 F.2d at

1568; *Martinez v. U.S. Sugar Corp.*, 880 F. Supp. 773, 775 (M.D. Fla. 1995). Accordingly, we reject plaintiffs' argument in this case that establishing a prima facie case is enough to defeat defendants' motion.

¶ 12. Keeping in mind that we review the trial court's findings of fact for clear error and conclusions of law de novo, we now turn to the merits of this case. In doing so, we recognize that defendant SCI has not had the opportunity to present a case so the factual record is one-sided. We also recognize that during trial the vast majority of the attention went to whether plaintiffs could pierce the corporate veil of BCI or SCI to reach the Stuarts directly.

¶ 13. Nevertheless, plaintiffs addressed successor liability in their requests for findings and conclusions of law, arguing that there was a de facto merger between BCI and SCI, SCI is a continuation of BCI, SCI is the alter ego of BCI, and the establishment of SCI was done to defraud creditors. In its decision, the court discussed only the de facto merger theory, and addressed it only briefly. The court rejected this theory with the following rationale:

> The facts ... do not support the claim that SCI is legally deemed to have undergone a de facto merger with BCI. First, in proportion to the overall size of its business needs, the BCI assets employed by SCI make an insignificant contribution. Second, and most importantly, while E.B.M. simply carried on the same business as Acousti-Phase under a different corporate shell, SCI in every meaningful respect is engaged in a different business than BCI. The imperative to develop a multiplex cinema defines the different nature of the business, accompanied by Mr. Stuart's acquisition and development of a wholly separate commercial complex in which to operate it.

The reference to E.B.M. and Acousti-Phase is to the parties in one of the two successor liability cases this Court has decided. In analyzing the superior court's decision and the successor liability issues, we start with those decisions.

¶ 14. The first was *Ostrowski v. Hydra-Tool Corp.*, 144 Vt. 305, 479 A.2d 126 (1984), a products liability case in which the plaintiff injured his hand while operating a press-brake machine manufactured by a corporation no longer in existence. The defendant was the second of two succeeding purchasers of the manufacturer's assets and continued to manufacture similar press-brake machines. We stated the general rule of successor liability as follows: "the liabilities of a prede-

cessor corporation will pass to the successor only when the change is occasioned by statutory merger or consolidation." 144 Vt. at 307, 479 A.2d at 127. In cases where the change is accomplished by the "sale of assets only," the purchasing corporation assumes no liabilities of the selling corporation unless one of the following five commonly accepted exceptions apply:

> (1) the buyer expressly or impliedly agrees to assume [the corporation's] liabilities; (2) the transaction amounts to a de facto merger or consolidation; (3) the purchasing corporation is merely a continuation of the selling corporation; (4) the sale is a fraudulent transaction intended to avoid debts and liabilities; (5) inadequate consideration was given for the sale.

*Id.* We declined to adopt either of two additional exceptions: the product line theory or the continuity of enterprise theory. *Id.* at 307-08, 479 A.2d at 127. The decision not to liberalize the exceptions in *Ostrowski* is of little consequence here because the additional rejected exceptions are designed to apply in tort cases, particularly those involving products liability. See, e.g., *Brown v. Econ. Baler Co.*, 599 So. 2d 1, 3 (Ala. 1992) (applying continuing enterprise test to products liability case); *Ray v. Alad Corp.*, 560 P.2d 3, 8-10 (Cal. 1977) (discussing policy reasons for imposing successor liability in products liability cases); *Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873, 883 (Mich. 1976) (adopting a continuity test for products liability suits). Thus, we declined to adopt the two additional exceptions because the successor: (1) did not create the risk of harm or benefit from the proceeds of the product's sale; (2) did not invite the product's use or make any safety representations; and (3) cannot enhance the safety of a product already in the marketplace. *Ostrowski*, 144 Vt. at 308, 479 A.2d at 127. We also reasoned that expanding the scope of the exceptions posed an economic threat to small business unable to bear the costs of an injured party's claim. *Id.*[3]

¶ 15. The second was *Cab-Tek, Inc. v. E.B.M., Inc.*, 153 Vt. 432, 571 A.2d 671 (1990). For purposes of this case, an important part of the

---

[3] Despite the *Ostrowski* holding, plaintiffs have argued that we find successor liability in this case on a theory of "continuing enterprise." This argument is not preserved and not properly before us. *Pion v. Bean*, 2003 VT 79, ¶ 45, 176 Vt. 1, 833 A.2d 1248. To the extent plaintiffs are urging the acceptance of the mere continuation theory, or a variation of it, our discussion in the text applies the proper scope of this theory to this case.

*Cab-Tek* holding is its conclusion that the *Ostrowski* exceptions to the general rule of successor liability apply in cases where a contract creditor is suing the successor corporation. 153 Vt. at 436, 571 A.2d at 673. The defendant, E.B.M., Inc., was a real estate management corporation owned by two individuals who were also directors of a corporation, Acousti-Phase, Inc., that manufactured stereo speakers. When Acousti-Phase ceased manufacturing because of a fire at its facility, defendant contracted with another company to manufacture the speakers and sold them under the Acousti-Phase name. Plaintiff was a supplier of Acousti-Phase that was owed money for supplying cabinet housings.

¶ 16. The trial court found the defendant in *Cab-Tek* liable on a theory of de facto merger, and we affirmed. We determined that the theory of de facto merger applied when the defendant used all the assets of Acousti-Phase without compensation, even though it did not purchase the assets as in *Ostrowski. Id.* at 436-37, 571 A.2d at 673. The de facto merger occurred because "E.B.M. absorbed Acousti-Phase when it took control over all of the Acousti-Phase assets without consideration, and Acousti-Phase ceased to function." *Id.* at 435, 571 A.2d at 672-73.

¶ 17. As a U.S. District Court in Texas recently recognized in a case applying Vermont corporate successor law, we have "not explicitly defined de facto merger," nor defined at all "what constitutes a mere continuation." *White v. Cone-Blanchard Corp.*, 217 F. Supp. 2d 767, 772-73 (E.D. Tex. 2002). The superior court analyzed the facts within the narrow confines of *Cab-Tek* and *Ostrowski* as if these decisions had fully explored, and set the outer contours for, corporate successor liability in Vermont. Thus, the court decided SCI's liability based solely on the de facto merger exception and solely on two factors that were present in *Cab-Tek* and *Ostrowski*, but that it found were not present here: the successor corporation purchased or used virtually all the assets of the predecessor corporation, and the successor and predecessor corporations are in the "same business," narrowly defined.

¶ 18. We understand that the trial court's approach appears consistent with the logic of *Ostrowski*, recognizing that the successor liability theories on which plaintiffs relied were exceptions to a general rule that "a sale of assets only" does not create successor liability. A narrow reading of the opinion suggests that a sale of substantial assets is a prerequisite to any consideration of these theories. This reading is clearly too narrow because *Cab-Tek* recognized successor liability based on de facto merger despite the fact that no sale of assets had

occurred. Indeed, it is not clear that any transfer of tangible assets occurred in *Cab-Tek*. Thus, this opinion must examine anew the relationship between successor liability and asset transfer.

¶ 19. We begin, however, by putting aside the asset transfer question and instead first turn to determining whether any of the successor liability theories would apply independent of asset transfer. The critical factor in this case, not present in *Ostrowski*, and only partially present in *Cab-Tek*, is that the successor corporation is owned by the same stockholders as the predecessor corporation. Plaintiffs argue that the SCI is really the continuation of BCI under a different corporate shell created in order to prevent one creditor of BCI, plaintiffs, from recovering the debt owed to them. Because of this aspect of the case, the *Ostrowski* exception most likely to apply, if any, is "the purchasing corporation is merely a continuation of the selling corporation." 144 Vt. at 307, 479 A.2d at 127.[4] The "mere continuation" exception is explained in an oft-cited treatise as follows:

> The mere continuation exception to the nonliability of successors applies when the transferee corporation is merely a continuation or reincarnation of the transferor corporation. In determining whether one corporation is a continuation of another, the test is whether there is a continuation of the corporate entity of the transferor not whether there is a continuation of the transferor's business operations.

> The traditional indications of "continuation" are: common officers, directors, and shareholders; and only one corporation in existence after the completion of the sale of assets. While the two foregoing factors are traditionally indications of a continuing corporation, neither is essential. In a "de facto merger" where one corporation is absorbed by another, there is continuity of the selling corporation evidenced by such things as the same management, personnel, assets, location and shareholders. Other factors such as continuation of the seller's business practices and policies and the sufficiency of

---

[4] As they have evolved, there is little difference between the de facto merger exception and the mere continuation exception. See *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 n.3 (2d Cir. 2003) (observing that de facto merger and mere continuation doctrines "are so similar that they may be considered a single exception"); *Nat'l Gypsum Co. v. Cont'l Brands Corp.*, 895 F. Supp. 328, 336 (D. Mass. 1995). We view the name of the exception as unimportant. See *Cab-Tek, Inc.*, 153 Vt. at 435, 571 A.2d at 672.

consideration running to the seller corporation in light of the assets being sold may also be considered. To find that continuity exists merely because there was common management and ownership without considering other factors is to disregard the separate identities of the corporation without the necessary considerations that justify such an action. However, the question of a successor's liability is distinct from the doctrine of disregarding the corporate entity.

The "mere continuation" of business exception reinforces the policy of protecting rights of a creditor by allowing a creditor to recover from the successor corporation whenever the successor is substantially the same as the predecessor. The exception is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors. In other words, the purchasing corporation maintains the same or similar management and ownership but wears a "new hat." To allow the predecessor to escape liability by merely changing hats would amount to fraud. Thus, the underlying theory of the exception is that, if [a] corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.

15 Fletcher Cyclopedia Corp. § 7124.10, at 298-301 (1999) (citations omitted); see *Baltimore Luggage Co. v. Holtzman*, 562 A.2d 1286, 1293 (Md. Ct. Spec. App. 1989) (explaining purpose and elements of rule); *Huray v. Fournier NC Programming, Inc.*, No. 0118602, 2003 WL 21151772, at *3 (Minn. Ct. App. May 20, 2003) (unpublished op.) (explaining that mere continuation exception applies when the transferee corporation "is merely a reincarnation of the transferor corporation").

■ ¶ 20. We now consider the most important factors of the mere continuation theory against the background of the instant case. The single most important factor for applying the mere continuation theory is the continuity of ownership and management. See *Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 693 (1st Cir. 1984); *Kaiser Found. Health Plan v. Clary & Moore, P.C.*, 123 F.3d 201, 205 (4th Cir. 1997); *Grand Labs., Inc. v. Midcon Labs*, 32 F.3d 1277, 1283 (8th Cir. 1994); *Gallenberg Equip., Inc. v. Agromac Int'l, Inc.*, 10 F. Supp. 2d 1050, 1053 (E.D. Wis. 1998) (applying Wisconsin law); *Vernon v. Schuster*, 688 N.E.2d 1172, 1176 (Ill. 1997) (finding continuity of ownership a

requirement of mere continuation theory). That factor is clearly present in the small closely-held corporations before us. Both BCI and SCI are owned by the Stuarts, and both are managed by Melvin Stuart.

¶ 21. The second most important factor for applying the mere continuation exception is whether only the successor corporation has survived. Here, it is undisputed that BCI is insolvent. Its only remaining assets have little value, and it owes the judgment amount to plaintiffs. Moreover, it has wound up its business operations and abandoned its place of business. See *In re Sunsport, Inc.*, 260 B.R. 88, 106 (Bank. E.D. Va. 2000) (concluding factor met where transferring corporation continued for a few months and went into bankruptcy because "[f]or all practical purposes, only [the successor corporations] remained after the asset sale"); *Huray*, 2003 WL 21151772, at *5 (finding sufficient that transferor corporation has "ceased operation" although it has not declared bankruptcy or dissolved).

¶ 22. Therefore, it is not significant that BCI has not been dissolved and thus technically continues to exist. See *Cargill, Inc. v. Beaver Coal & Oil Co.*, 676 N.E.2d 815, 819 (Mass. 1997); *Flotte v. United Claims, Inc.*, 657 S.W.2d 387, 389 (Mo. Ct. App. 1983); *Gall Landau Young Constr. Co. v. Hedreen*, 816 P.2d 762, 766 (Wash. Ct. App. 1991). Nor is it significant that BCI remained in operation for a very short period after SCI's multiplex cinema opened. As Melvin Stuart's testimony reflected, it was unlikely that the BCI theaters could withstand the competition from the multiplex theaters, and it quickly became clear that they could not generate sufficient revenues to cover expenses.

¶ 23. As a third factor, a number of jurisdictions hold that, for the mere continuation exception to apply, any assets transferred to the successor corporation must be transferred without adequate consideration. See, e.g., *Ray v. Alad Corp.*, 560 P.2d at 7. Here, to the extent there were assets transferred, no consideration was provided for the transfers.

¶ 24. A fourth factor is whether the successor business is the same business as the previous one. In examining this factor, we emphasize that, while continuation in the same business is relevant, continuity of business operations is less important than continuity of ownership and direction. See *Kaiser Found. Health Plan*, 123 F.3d at 205; *Grand Labs., Inc.*, 32 F.3d at 1283; *Vernon*, 688 N.E.2d at 1176; see also 15 Fletcher Cyclopedia Corp., *supra*, at 298 ("In determining whether one corporation is a continuation of another, the test is

whether there is a continuation of the corporate entity of the transferor not whether there is a continuation of the transferor's business operations."). Here, we acknowledge that (1) the superior court concluded that SCI "in every meaningful respect is engaged in a different business than BCI," and (2) this conclusion was central to the court's determination that a de facto merger did not occur. While a narrow view of the nature of the businesses might be appropriate in a products liability case — the most common circumstances for application of the mere continuation exception — we conclude that the court viewed the nature of the businesses too narrowly in this case. Both SCI and BCI were in the movie theater business, and both ran the only movie screens in the Bennington area. The fact that SCI's theater was larger and in a different location does not transform the nature of its business into something different from BCI.

¶ 25. Additional indicia that support application of the mere continuation exception are present in this case. For example, SCI used, and took over, the telephone number of BCI. See *Kaiser Found. Health Plan*, 123 F.3d at 205; *Cargill*, 676 N.E.2d at 819. Further, most of the BCI employees, including the theater manager, became SCI employees. See *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 650 (5th Cir. 2002); *Paradise Corp. v. Amerihost Dev., Inc.*, 848 So. 2d 177, 181 (Miss. 2003) (same supervisory employees); *Brockmann v. O'Neill*, 565 S.W.2d 796, 798 (Mo. Ct. App. 1978) (same labor force and supervisors). Moreover, SCI selectively paid BCI's debts as necessary to get started, failing to pay only the debt owed to plaintiffs. *Cargill*, 676 N.E.2d at 819.

¶ 26. Finally, there is another factor in this case that is not present in most of the decisions from other jurisdictions, although it is partially suggested by the court's overview in *Flotte v. United Claims*, 657 S.W.2d at 389:

> We cannot, in fairness, permit the sole shareholder of one corporation to organize another and transfer all the corporate property from the former to the latter without paying all the corporation's debts. The new corporation can only be regarded as a mere continuation of the former under a different name.

As the Fletcher treatise quoted earlier states, "the underlying theory of the [mere continuation] exception is that, if [a] corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability." 15 Fletcher

Cyclopedia Corp., *supra*, at 301. Here, irrespective of intent, the effect of Stuart's actions was that BCI did not pay its rent and the Stuarts' new movie theater business gained an improved competitive position.

¶ 27. By way of comparison, in *Association of Haystack Property Owners, Inc. v. Sprague*, 145 Vt. 443, 448, 494 A.2d 122, 125 (1985), the plaintiff creditors sued the directors of an insolvent closely held corporation asserting that, in managing the business into insolvency, the directors had breached a fiduciary duty to the creditors by protecting their own financial interests while leaving the creditors unpaid. We reversed an order dismissing the complaint, noting that some courts have held that "corporate directors do owe a fiduciary duty to creditors, particularly when the corporation becomes insolvent." *Id.* (citations omitted). The U.S. Court of Appeals for the Second Circuit noted the *Sprague* decision and found it consistent with the majority rule that permits injured creditors of an insolvent company to sue directors for mismanagement. See *In re STN Enters.*, 779 F.2d 901, 904-05 (2d Cir. 1985). After remand, the U.S. Bankruptcy Court for the District of Vermont concluded "that Vermont would follow the 'majority rule' to allow creditors a 'qualified right' to sue, on behalf of the debtor corporation under circumstances presented in this adversary proceeding, for breach of fiduciary duty, fraudulent conveyances, and director negligence against directors or officers." *In re STN Enters., Inc.*, 73 B.R. 470, 490 (Bank. D. Vt. 1987). We agree that this is the correct reading of *Sprague*. See also *Hardwick-Morrison Co. v. Albertsson*, 158 Vt. 145, 150-51, 605 A.2d 529, 532 (1992).

¶ 28. The duty to creditors applies not only when the corporation is technically insolvent, but also when the corporation operates in the vicinity or zone of insolvency. See *Roselink Investors v. Shenkman*, No. 01CIV7176, 2004 WL 875262, at **2-3 (S.D.N.Y. May 19, 2004) (Delaware law); see also S. Schwarcz, *Rethinking a Corporation's Obligations to Creditors*, 17 Cardozo L. Rev. 647, 678 (1996) (arguing that fiduciary duty arises as to directors "of an insolvent corporation, or of a corporation whose actions have a reasonable expectation of resulting in insolvency"). Because Stuart's actions advanced his own interests while leaving BCI insolvent and unable to pay its debt to plaintiffs, the duty to creditors appears to apply here. See L. Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors*, 46 Vand. L. Rev. 1485, 1489 (1993) (defining "insolvent" as when liabilities exceed the value of assets, or when the company is unable to pay its debts as they come due).

¶ 29. We recognize that any claim of a breach of fiduciary duty would run, if at all, against the officers and directors of BCI, and we have no such claim on appeal. Nevertheless, the beneficiary of any such breach was SCI, the business left standing in a better market position and without a competitor. Therefore, the steps taken to get SCI to that position are relevant on a theory of successor liability.

¶ 30. We now return to the relationship between asset transfer and successor liability, the most difficult issue in this case. As the superior court found, the transfer of physical assets was relatively minor in this case, largely because defendant was not using the limited assets of BCI in the SCI facility. Although it is not fully explored in the evidence, it appears that in the movie theater business the critical asset is accessibility to films for public viewing. By virtue of Stuart's decision-making, and possibly that of the suppliers, SCI had such access and BCI did not. Moreover, Stuart had years of experience in selecting films that would attract the public, and he switched his expertise, as well as his employees, to SCI. Finally, SCI acquired whatever goodwill BCI had with the joint advertising and telephone listing. As BCI approached and became insolvent from these actions, all of the actions benefitted Stuart and his new corporation and left plaintiffs with no access to income and assets to collect its rent.

¶ 31. In many ways this case is similar to *Cab-Tek*, although the superior court neither recognized nor discounted the similarities. As we discussed above, the defendant corporation in that case used, but did not acquire, the assets of a speaker manufacturing corporation without compensation after that corporation went out of business because of a fire. As in this case, the assets in that case were largely intangible — the brand name under which the speakers were sold and the customer list — although defendant also used the furniture of the defunct corporation. 153 Vt. at 434, 571 A.2d at 672. Also, as in this case, the overlapping directors of both defendant and the speaker corporation advanced their own ownership interest at the time of the insolvency of the speaker corporation at the expense of that corporation's creditor, plaintiff in the case. Successor liability in this case, as it was in *Cab-Tek*, would be based on the underlying philosophy that a mere change in form — a "new hat" — cannot be used to escape liability.

¶ 32. This case is also similar to a leading case, *Stanford Hotel Co. v. M. Schwind Co.*, 181 P. 780 (Cal. 1919), where successor liability was found. In *Stanford Hotel*, a corporation that ran four restaurants in San Francisco transferred three of these restaurants to a new corpora-

tion, with similar ownership, in order to put the fourth restaurant out of business and default on the lease with plaintiff. The old corporation was left without assets to pay the rent, and the lessor sued the new corporation for the rent. The California Supreme Court sustained the theory of liability:

> But it is well established in this state that under circumstances such as these, where a corporation reorganizes under a new name, but with practically the same stockholders and directors, and continues to carry on the same business, a court of equity will regard the new corporation as a continuation of the former corporation, and will hold it liable for the debts of the former corporation. The allegations of the complaint as to the scheme to avoid fraudulently the payment of the plaintiff's rent go to the point of making out, as they do, that the defendant, by name the M. Schwind Company, is, in fact, the tenant formerly by name the Maryland Dairy Lunch Company. That equity will strip off the mask of a separate corporate identity, when it is but a mask, is amply sustained by these authorities.

*Id.* at 783 (citations omitted). There is no indication in *Stanford Hotel* whether defendant reused any assets that were in the restaurant location leased from plaintiff; this was a minor factor, if any, in the decision. The important consideration was that recourse to the old corporation was not available. See *Beatrice Co. v. State Bd. of Equalization*, 863 P.2d 683, 690 (Cal. 1993) (finding new corporation not liable "when recourse to the debtor corporation is available"). Thus, in *Shea v. Leonis*, the court noted that "[t]he equitable principle underlying [*Stanford Hotel*] is equally applicable where, as in the instant case, the device adopted is not a transfer of assets, but an attempt to avoid liability for benefits enjoyed by means of taking the obligation in the name of a specially organized corporation which has no other assets." 92 P.2d 400, 402 (Cal.), *aff'd on reh'g*, 96 P.2d 332, 333-34 (Cal. 1939).

¶ 33. *Stanford Hotel* represents a variation of a group of corporate split cases where a company has both a profitable and unprofitable product line and creates a new corporation and transfers to it the profitable product line, with associated assets. See Schwarcz, *supra*, at 678-79. The old corporation may be left with inadequate assets to pay creditors and no prospect of developing those assets. This case is similarly a variation of the corporate split cases.

¶ 34. We cannot conclude that this case is "markedly different" from *Cab-Tek* as the superior court held. The fact that SCI acquired only limited tangible assets from BCI does not prevent the application of successor liability in this case.

¶ 35. The superior court ruled that the facts did not support plaintiffs' successor liability claim because there was no transfer or use of significant assets and SCI was engaged in a different business from BCI. As our foregoing discussion reflects, we believe that the court erred in defining and applying the applicable principles of successor liability in this case. Thus, its conclusion that plaintiffs' claims against SCI "cannot under the controlling law be maintained," V.R.C.P. 52(c), was erroneous. In reaching this conclusion, we reiterate that we are relying upon the one-sided record developed by plaintiffs and our recitation of the applicable facts must be seen in this light. It may be that when defendant has the opportunity to put on its evidence, the case will appear different under the successor liability principles we have adopted. We reverse the judgment entered as a matter of law against plaintiffs and remand for the court to hear defendant's case on the issue involved in this appeal and decide the case based on all the evidence.

*Reversed and remanded for further proceedings consistent with this opinion.*

