VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      25-AP-276

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JANUARY TERM,   2026

In re A.K. and A.C., Juveniles
(S.K., Father\*)

}  APPEALED FROM:
}
}  Superior Court, Washington Unit;
}  Washington Unit, Family Division
}  CASE NOS. 22-JV-01921 & 23-JV-00395
Trial Judge: Kristin Schoonover

In the above-entitled cause, the Clerk will enter:

Father appeals a family division order terminating his parental rights to his children A.K. and A.C., born in September 2019 and March 2023, respectively.[1]  On appeal, father argues that the court erred in denying a motion for judgment in his favor and reopening the evidence, and the evidence did not support the court's finding that there was a change of circumstances due to stagnation.  We affirm.

The court found the following.  When A.K. was born, she lived with her parents and her father provided primary care.  When A.K. was two, mother started abusing crack cocaine and father begun abusing alcohol.  Father and A.K. moved in with father's biological mother for a period, but he returned to live with mother even though he knew they could not safely parent A.K.  In December 2022, the State filed a petition alleging that A.K. was a child in need of care or supervision (CHINS).  At the time, mother was abusing heroin daily without treatment, father was drinking heavily, the family was living in a car, and A.K. was filthy, unfed, and unsafe.  The court granted custody of A.K. to the Department for Children and Families (DCF).

In March 2023, shortly after A.C.'s birth, the State filed a CHINS petition alleging that A.C. lacked proper parental care.  A.C. was born addicted to substances and required transport to University of Vermont Medical Center at birth.  In May 2023, parents stipulated that the children were CHINS.  As part of its June 2023 disposition order, the court adopted a case plan that included action steps for each parent.  Among other things, father was required to complete a drug assessment and following recommendations, demonstrate long-term sobriety, attain

---

[1]  The court also terminated mother's parental rights.  She has not appealed and therefore this decision focuses on the facts related to father.

emotional stability through mental-health counseling, demonstrate learned skills, engage in Family Time coaching, work with DCF, attend the children's appointments, and find safe and stable housing. The case plan had a goal of reunification by November 2023, which was subsequently extended to March 2024 and then to May 2024.

During this time, father's progress was minimal. Although father loved his family, he was unable to meet the expectations in the case plan. Father missed visits with the children as well as team meetings and other necessary appointments. Father lacked permanent housing. In December 2023, father started working with a licensed therapist to help him with anger management, depression, anxiety, and impulse control. Father continued to miss parent-child contact for a variety of reasons. When mother used drugs, father was concerned and would not leave her. Father's absence from scheduled visits significantly impacted the children, particularly A.K. She experienced extreme emotional dysregulation and acted out in self-harming ways, hitting her head on the floor, misbehaving at school, hiding, and threatening to jump out of windows. In August 2023, DCF reduced father's visits due to his inconsistency and the negative impact on A.K. Eventually, visits were at DCF's discretion.

In May 2024, the State filed petitions to terminate parents' rights based on their lack of progress towards the goals in the case plan. In December 2024, father became intoxicated and called his mother. He was afraid he was losing his children and snapped. He threated to kidnap the children and speculated that he understood why DCF workers got shot. He threatened suicide and forwarded a photograph of a BB gun. Police were contacted and father later apologized to DCF. In January 2025, father had three visits but did not attend the subsequent two visits. This caused A.K. to become dysregulated and DCF stopped visits altogether because father's inconsistency was too hard for the children.

The court held hearings on the termination petition in March and May 2025.[2] Following the hearing, the court found that there was a change of circumstances due to parents' lack of progress. As to father, the court acknowledged that father had made recent progress towards some of the goals in the case plan. By May 2025, father was in temporary housing, had been sober for three months, was engaged in treatment court, and was active in groups and therapy. The court found that father's progress was recent though and not enough given the goals in the case plan and the needs of the children. The court emphasized that father had not demonstrated an ability to maintain his recent progress or an ability to parent two young children with significant needs, especially given his failure to consistently visit with the children.

The court also found that termination of father's rights was in the children's best interests. The children were bonded with their foster family. A.C. did not have a strong relationship with father, and although A.K. had a strong relationship with father when she was young, her relationship weakened over time. The children were well-adjusted to their home life with the foster family and engaged in a variety of activities. Given the children's young ages, time in custody, and need for permanency, father was not able to resume parenting within a reasonable time. Finally, father did not have a constructive impact on the children's lives, given his inconsistent visits, which had a devasting impact on A.K. in particular. Therefore, the court granted the State's petition. Father appeals.

---

[2] The termination hearing was originally scheduled for January 2025, but it was continued after mother was not present and father relayed that she was in a car accident and unable to attend that day.

When the State moves to terminate parental rights after the initial disposition, the court must first find that there is a change of circumstances, 33 V.S.A. § 5113(b), and second, "that termination of parental rights is in the child's best interests." In re K.F., 2004 VT 40, ¶ 8, 176 Vt. 636 (mem.). In assessing the child's best interests, the court must consider the statutory criteria. 33 V.S.A. § 5114. The most important factor is whether the parent will be able to resume parenting duties within a reasonable period of time. In re J.B., 167 Vt. 637, 639 (1998) (mem.). On appeal, we will uphold the family court's conclusions if supported by the findings and affirm the findings unless clearly erroneous. Id.

Some of father's arguments relate to how the termination proceeding was conducted and some additional background is helpful. In March 2025, at the first day of the termination hearing, the State submitted thirteen exhibits without objection and presented testimony from the DCF supervisor for the caseworker assigned to A.K. and A.C. The DCF supervisor testified that father had not achieved several goals in the case plan because he had not demonstrated sobriety, there remained concerns about his emotional health following his behavior in December 2024, he had not gained parent education, he had not attended school and medical appointments, and he did not have stable housing. During cross-examination, father's attorney questioned whether the DCF supervisor was aware that father had taken a parent-education class, had a therapist, and had engaged in treatment court, but the supervisor did not have knowledge of these matters. The State also presented testimony from the children's foster mother.

At the close of the State's case, father's attorney argued that the State had not met its burden of showing that there was a change of circumstances due to stagnation given father's progress on several action steps, and moved for a "directed verdict." The State responded that father had not achieved any greater emotional stability, even if he had a therapist, given his statements in December 2024 that he would kidnap his kids and potentially harm a DCF worker or himself. The State also pointed out stagnation was demonstrated by father's continued missed visits and the fact that father's sobriety was relatively recent.

In response, the family division noted that it was not aware of a "directed verdict standard" for a termination case, and its role was to assess whether the State met its burden by clear and convincing evidence. The court ultimately denied the motion. After a break, father indicated that he did not intend to present any evidence. The children's attorney immediately asked to call witnesses, representing that she had intended to cross-examine father's witness. Father argued that the case was now closed and objected to reopening the evidence. The court provided the parties with an opportunity to brief the issue. Following briefing by the State and father, the court granted the motion to reopen the evidence because the children's attorney moved to reopen in a timely way, the witnesses were still available to testify at that time, and the evidence was relevant to termination of father's rights. Moreover, the court relied on the fact that the purpose of the proceedings was to ensure timely permanency for the children, and reopening the evidence would avoid needless delay. The court then held a second day of hearing in May 2025.

On appeal, father makes several arguments related to this process. First, he makes allegations regarding the conduct of the court, claiming that the family division impermissibly took over the prosecution of the case, and erred in commenting on the state of the evidence at the close of the State's case. Father's characterization of the court's conduct as prosecuting the matter or stepping out of its role as neutral arbiter is unfounded. The record indicates that the court at all times acted well within its role. This case is wholly unlike Auger v. Auger, 149 Vt. 559, 563-64 (1988), where the court took over control of presenting evidence, terminated

3

testimony of the defendant's key witness, and announced its inclination favoring the plaintiff early on, among other things. Here, the court remained neutral, listened to all parties, did not take over questioning, made decisions based on the evidence, and provided all parties with an opportunity to be heard.

Father next contends that the court erred in denying his motion for judgment as a matter of law. Father asserts that the family division incorrectly stated that a motion for judgment as a matter of law was not available in a termination proceeding. Father misstates what occurred below. In the family division, father asked for a "directed verdict." Accordingly, the trial court responded that she was not "aware if there's a directed-verdict standard in a [termination of parental rights] case." Indeed, a directed verdict implies a proceeding involving a jury and is not applicable in termination proceedings before a judge. See V.R.F.P. 2, 3 (providing that civil rules generally apply to termination proceedings but excluding Vermont Rule of Civil Procedure 50 pertaining to directed verdict). In any event, the court did not deny the motion because it determined that father could not file one; rather, it proceeded to rule on the motion on its merits. Moreover, because father asked for a directed verdict below and now alleges that the court erred in not granting judgment as a matter of law under Vermont Rule of Civil Procedure 52(c), it is not evident that father has preserved this issue for appeal. See In re A.M., 2015 VT 109, ¶ 28, 200 Vt. 189 (providing that to preserve issue party must present it with "specificity and clarity" to give trial court opportunity to rule on it (quotation omitted)).

Even if preserved, father has failed to demonstrate that there was any error in denying his motion. On appeal, when reviewing a decision on a motion for judgment as a matter of law under Rule 52(c), this Court reviews the trial court's legal conclusions "de novo, and its underlying factual findings for clear error." Gladstone v. Stuart Cinemas, Inc., 2005 VT 44, ¶ 10, 178 Vt. 104. In assessing the motion, the trial court acts as the trier of fact, "weighing the evidence and determining whether the nonmovant has established a right to relief." Id. ¶ 11. Here, father essentially claimed that the State had failed to provide sufficient evidence to show that father's progress had stagnated. Father argued that he had achieved most of the action steps in the case plan, asserting that he was in treatment court, was doing counseling to address his mental health, took a parent-education class, and was cooperating with DCF. The State responded that even though father made some progress, he had not achieved the goal of the case plan. For example, the State noted that even though father was working with a counselor, he had not attained greater emotional stability, as evidenced by his statements in December 2024 that he would potentially harm a social worker or himself or kidnap his children. The State also highlighted that father's sobriety was fairly recent and that his housing was not long-term. Finally, the State argued that father had not prioritized the children as shown by father's lack of attendance at their medical or school appointments and inconsistent visits.

In denying father's motion, the court explained that although father had met some of the goals, he did not consistently attend visits with the children and that had negative impact on the children. The court noted that much of the State's case was presented through the DCF supervisor, who lacked direct experience with father and that it could not make findings by clear and convincing evidence based on hearsay. In particular, the court identified that the evidence of the December 2024 incident was all hearsay. On the other hand, the court explained that there was no direct evidence of some of father's claimed progress, including that father was in treatment court. Ultimately, the court indicated that there were no grounds for a directed verdict. Given the state of the evidence at the time, some of which provided a basis to find stagnation, the court acted within its discretion in denying the motion at the close of the State's case.

Father also claims that the court abused its discretion in granting the motion to reopen the evidence. This Court has previously held that "[t]he trial court has 'broad discretion' in ruling on a motion to reopen filed after the close of evidence but prior to final judgment." In re G.L., 2024 VT 60, ¶ 38 (quoting In re Bjerke Zoning Permit Denial, 2014 VT 13, ¶ 16, 195 Vt. 586). Here, the court acted within that discretion given that the motion was made immediately after father chose not to present any evidence, the evidence sought to be presented was relevant to the issues in the case, and the witnesses were still available and present. Most importantly, as the family division emphasized, reopening the evidence furthered one of the overall goals of juvenile proceedings—to provide timely permanency to children. See In re C.L.S., 2021 VT 25, ¶ 15, 214 Vt. 379 (interpreting juvenile provisions in statute in light of overall statutory purpose to " 'ensure that safety and timely permanency for children are the paramount concerns in the administration and conduct of proceedings under the juvenile judicial proceedings chapters' " (quoting 33 V.S.A. § 5101(a)(4)).

Father next argues that the evidence does not support the family division's finding that father's progress had stagnated. "Stagnation may be found if the parent has not made the progress expected in the plan of services for the family despite the passage of time." In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639 (mem.). The steps in the case plan are not, however, merely a checklist and "the main concern must always be whether the individual parent has demonstrated the improvement contemplated at the time the children were removed from the parent's care." Id. ¶ 7.

As part of his argument, father asserts that several specific findings are not supported by the evidence. "This Court will uphold findings by the family court unless they are clearly erroneous." In re J.B., 167 Vt. at 639. When findings are challenged on appeal, this Court's role is limited to assessing whether "they are supported by credible evidence" because it is up to the family division "to determine the credibility of the witnesses and to weigh the evidence." In re A.F., 160 Vt. 175, 178 (1993).

First, father claims that the evidence does not support the court's finding that he first realized the need to put the children's needs over mother "[i]n Spring 2025." Father claims that testimony showed his progress accelerated in mid-to-late 2024 and he committed to putting his children first in fall of 2024. While there may have been evidence to the contrary, there was evidence to support the court's finding that father put his relationship with mother ahead of the children and that this did not begin to change until spring 2025. Father testified that he put mother before the children when the case began and through 2024. On the first day of the termination hearing in March 2025, the DCF supervisor's testimony demonstrated that father had not prioritized the children. She testified that father was inconsistent in his communication with DCF, and his attendance at visits, team meetings, family time, and the children's school meetings. In addition, she noted that he did not attend the children's medical appointments. She also testified that the parents engaged in toxic behaviors towards each other and that at that time they were living in a hotel. In May 2025, father stated that parents were still a couple and mother continued to use drugs. Father acknowledged that he missed visits with the children because he was more worried about mother than seeing the children. In addition, father testified that he went to a team meeting in January 2025, but he had to leave because it was too stressful. This evidence supports the court's finding that in spring 2025 father was just beginning to learn how to put the children's needs over his relationship with mother.

Second, father attacks the court's finding that father's stated reasons for missing visits, including "having other appointments, missing the bus, needing to tend to mother," showed his

failure to prioritize the children's needs and that father's recognition of the need to focus on the children came late in the case. In a related claim, father asserts that that the evidence fails to support the court's finding that mother "continues to abuse substances and father remains solidly supportive of her, which gives the court concerns whether father can maintain his focus on the children's needs when they conflict with mother's needs." Father asserts that his reasons for missing visits in January and February 2025 were legitimate and that he notified DCF in advance. He also claims that entering transitional housing without mother showed his intent to distance himself from her. The evidence supports the court's view that father's missed visits demonstrated his failure to prioritize the children, and that father continued to have a relationship with mother. Father conceded that his visits were inconsistent, that DCF informed him of the impact of missed visits on the children, and that DCF arranged for him to have transportation. He also stated that the missed visits were due to lack of transport, being homeless, and because he was more worried about mother than being at the visits.

Third, father challenges the court's finding that the December 2024 incident demonstrated that father's emotional stability achieved through his counseling was "very recent." Relying on the testimony of his counselor that the incident was a one-time mistake, father claims that his emotional stability was not recent. The finding was not erroneous. Father became intoxicated and made very concerning statements to his mother in December 2024, threatening to harm himself or a DCF worker and to kidnap the children. Even father agreed that these statements did not demonstrate emotional stability. Although father's counselor indicated that this was due to father's intoxication and he did not believe the incident indicated a failure on father's part to make progress over time, father's sobriety was still fairly recent, and the court was not required to credit this testimony.

Fourth, father asserts that the evidence did not support the court's finding that father "will likely not have permanent housing that is safe and suitable for children for an extended period of time, possibly years, given the current housing market." Father claims that the evidence showed that if he had a "reunification voucher," he would obtain permanent housing and therefore this finding was unsupported. The crux of the court's finding was that although father was in transitional housing, he did not have permanent safe and suitable housing for children and it was not likely he would obtain that in a time period reasonable for these children, who had been in custody for over two years. The following evidence supports the court's finding: the children could not reside in father's transitional housing; father would not qualify for a reunification voucher until there was a goal of reunification and father was ready for custody three days a week; father had not had visits with the children since January 2025. Despite father's housing at the time of the May 2025 hearing, the court's assessment that father would not be able to provide safe and stable housing for the children in a reasonable time was supported by the evidence.

Finally, father claims that overall, the evidence does not support a finding of stagnation because he made substantial forward progress towards the goals in the case plan. Father highlights his sobriety, his transitional housing, his engagement with treatment court, and his work with his counselor towards improving his behavior. "A finding that a parent has made some progress does not, however, preclude a finding of changed circumstances." In re B.M., 165 Vt. 331, 336 (1996). Where a parent's progress stagnates for a long period and there is then significant progress after the termination petition is filed, "[f]rom the child's perspective, at least, the earlier period of stagnation is not necessarily wiped out by the later improvement." Id.

Here, the court found that father's progress was recent and even with that progress he was not able to provide safe and consistent parenting to the children given that he had not seen them

since January 2025 and had not demonstrated a consistent ability to focus on their needs. The evidence, outlined above, supports this assessment. A.K. came into custody in December 2022 and A.C. in March 2023, just after birth. Although father made some improvement late in the duration of the case, this came much later than anticipated and there remained significant obstacles, most importantly that father was not having contact with the children and lacked an understanding of their developmental, educational, emotional, and medical needs. There is no merit to father's assertion that the cessation of contact with the children was a matter beyond his control. Father's inconsistent contact with the children was not limited to the two visits that he highlights; it was an issue throughout the case and had a negative impact on the children. See In re K.G., 2023 VT 51, ¶¶ 32-33, 36, 218 Vt. 419 (concluding that mother's stagnation caused in part by failure to consistently attend visits was matter within her control). The evidence supports the court's finding that father's progress stagnated.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Nancy J. Waples, Associate Justice

7