712 A.2d 895 (1998)
In re J.B., Juvenile.
No. 96-603.
Supreme Court of Vermont.
April 27, 1998.
*896 Before AMESTOY, C.J., and DOOLEY, MORSE, JOHNSON and SKOGLUND, JJ.

ENTRY ORDER
The mother of J.B. appeals a Franklin Family Court order terminating her parental rights and responsibilities (TPR) as to the child, and transferring custody and guardianship to the Commissioner of Social and Rehabilitation Services (SRS) without limitation as to adoption. We affirm.
The State filed a petition in August 1994 alleging that the seven-week-old J.B. was a child in need of care and supervision. The petition was based on mother's alleged sexual assaults on her twelve-year-old son, J.B.'s half-brother. The court entered a CHINS order in December 1994, and disposition proceedings began on January 13, 1995. Due to continuances requested by the parties, and mother's wish to complete a psychosexual evaluation, the final disposition hearing commenced on September 27, 1995. The matter was then further continued at mother's request, and the continued disposition hearing was completed in September 1996.
We recount the relevant facts as found by the family court. Mother, who was herself the victim of physical abuse as a child, was married in 1981 to "a very abusive man who would threaten [her] with guns and knives." A son, J.R., was born in 1982, and the marriage finally broke down in 1991 when the husband struck both mother and J.R. She obtained a temporary restraining order that year after stating that her husband had made death threats and was "into pornographic material." This marriage subsequently ended in divorce.
In 1992, mother and J.R. moved to Vermont, where she met a boyfriend by whom J.B. was born in July 1994. A baby sitter subsequently advised SRS of alleged incidents of sexual abuse of J.R. by both J.R.'s mother and her boyfriend. Under later questioning by an SRS investigator and a police detective, J.R. divulged numerous incidents of sexual abuse by his mother and her boyfriend, both of whom were subsequently arrested for sexual assault.
The boyfriend pled guilty to two counts of sexual assault on a minor and was sentenced to a term of incarceration. Mother pled guilty to sexual assault in October 1994, and was sentenced to serve five years, all suspended, and probation. J.R. and J.B. were placed in foster care, with supervised visitation by mother. Her conditions of probation included, among other things, that she participate in individual and self-esteem/relationship counseling and in outpatient sex-offender counseling.
The court found that, as of May 1995, mother "continued to minimize her participation in and responsibility regarding the sexual abuse of [J.R.]." As a result she was "still an untreated sex offender," and the court found that "[i]t was unclear as to how long it would take [mother] to complete this treatment." The court also found that J.B.'s "attachment and long term emotional needs were of great concern. His need to attach to his caregivers was of paramount importance to his healthy emotional growth and development. This bond appeared to be already formed with the foster family."
The court considered the criteria set forth in 33 V.S.A. § 5540[*] and found that psychologically *897 J.B. saw the foster parents as his parents, had a close relationship with the other children in the foster home, and did not derive the same comfort from his relationship with mother. The court concluded with respect to § 5540(1) that "removing [J.B.] from this [foster] home to return to the care of [either parent] would mean a loss of these meaningful relationships." The court concluded as to § 5540(2) that J.B. had adjusted so well to his foster home that "moving him from this environment ... could put him at serious risk of long-term psychological harm." As to § 5540(4), the court concluded that, despite clearly demonstrated love and affection for J.B. by his mother, the child had not established a close attachment with her.
The final and overarching question for the court was to determine "[t]he likelihood that the natural parent will be able to resume his [or her] parental duties within a reasonable period of time." Id. § 5540(3). The court acknowledged that mother had made "substantial progress in dealing with her psychological difficulties," including individual therapy and sex offender counseling. The court, however, also stressed specific areas in which mother had not progressed sufficiently:
[Mother's] potential vulnerability to the influence of others remains a problem. [She] has only just begun to understand and express assertive behavior and needs more time to practice these skills. She may be influenced by and vulnerable to outside negative influences and potentially abusive individuals. Sex offender treatment is still ongoing and [J.B.] might be in some jeopardy if he were placed with [mother] at this time.
The court ordered termination of mother's parental rights and responsibilities, and the present appeal followed.
Mother's first argument is that the record lacks clear and convincing evidence to support the family court's finding that she would be unable to resume her parental duties within a reasonable time. See id. According to mother, the court's order punishes her for past bad behavior without taking account of the progress she has made since the time J.B. was removed from her custody. While we agree with mother that the critical inquiry under § 5540(3) is the parent's prospective ability to parent, see In re B.M., 165 Vt. 331, 337, 682 A.2d 477, 480 (1996), we discern no error in the family court's finding.
Vermont law makes plain that a family court may terminate parental rights only when it finds by clear and convincing evidence that to do so is in the best interests of the child as determined by consideration of four statutory factors in 33 V.S.A. § 5540. See B.M., 165 Vt. at 336, 682 A.2d at 478-80. The most important factor for the court to consider is the likelihood that the parent will be able to resume parental duties within a reasonable time. See In re M.M., 159 Vt. 517, 523, 621 A.2d 1276, 1280 (1993). Parents are safeguarded from arbitrary or erroneous state action by "a general policy that total termination of parental rights will not be ordered in the first instance if there is a reasonable possibility that the causes and conditions which led to the filing of the petition can be remedied and the family restored within a reasonable time." In re D.R., 136 Vt. 478, 481, 392 A.2d 951, 953 (1978). This Court will uphold findings by the family court unless they are clearly erroneous. See In re H.A., 153 Vt. 504, 515, 572 A.2d 884, 890 (1990). The family court's conclusions will be upheld if they are supported by the findings. See In re J.R., 153 Vt. 85, 94, 570 A.2d 154, 158 (1989).
As evidence that she has made good progress since the time when J.B. was taken into SRS custody, mother notes that she admitted responsibility for past sexual abuses, attended every visitation with J.B. which was provided, save one which was beyond her control, and participated in every service mandated in her case plan. She points to the court's statement concerning her "substantial progress" in dealing with her psychological difficulties. According to mother, the court's termination order is inconsistent with the undisputed evidence that she was meeting the expectation of her case plan.
As did the family court, we recognize mother's progress since the time J.B. was *898 removed to SRS custody. Yet the primary consideration is whether a parent will be able to resume her parental duties within a reasonable period of time, not merely whether there has been identifiable progress since the child was originally removed from the household. We do not agree with mother's contention that the family court may not terminate parental rights if the parent has made progress. See In re A.F., 160 Vt. 175, 181-82, 624 A.2d 867, 871 (1993) (although parent had made progress in parenting skills, finding that parent would not be able to resume parenting within a reasonable time was supported by the evidence and not erroneous).
In the instant case, the record amply supports the family court's conclusion that mother's progresscommendable as it might be given her life experiencehad not brought her to a point where she could safely resume parenting within a reasonable time. The litany of abusive incidents involving mother both as victimizer and victim was extensive and graphic. Early in the case, mother was diagnosed as having an adjustment disorder with depressed mood, and described by evaluators as being in a pattern of co-dependence in relationships with abusive, substance-dependent men. With respect to mother's subsequent treatment progress, the court considered reports from a psychologist and social workers, and found that mother "is still vulnerable to getting into another abusive relationship," and that
[i]t is difficult to estimate when [mother] will be psychologically healthy enough to safely parent [J.B.]. A "reasonable period of time" for parenting to occur in this case has already expired.... Removing him after this period of time from an environment where he has strong attachments and feels secure and safe would not be in his best interests.
Mother is correct that past conduct itself is no barrier to resuming parental responsibilities. Nonetheless, we cannot say that the court erred, in light of the detailed evidence about the extent of mother's past behavioral problems and the lack of certainty about the extent of her progress. See B.M., 165 Vt. at 337, 682 A.2d at 480 ("a `reasonable period of time' must be measured in terms of the child's needs").
Mother next argues that the family court erred by giving undue weight to what she calls the "psychological parent role that the foster parents have come to play in J.B.'s life." Mother cites In re J. & J.W. for the proposition that a child's strong psychological parent-child relationship with his foster parents should not provide the primary basis for terminating parental rights, particularly when the parent is making marked improvement. See 134 Vt. 480, 484-85, 365 A.2d 521, 524 (1976). We do not agree with mother's argument because we find no inconsistency between our holding in J. & J.W. and the family court's decision in this case. In J. & J.W., the Court held that a strong psychological parent-child bond between the child and the foster parents, standing alone, could not provide a basis for finding the "changed circumstances" necessary to modify an existing order and terminate parental rights. See id. at 484, 365 A.2d at 524. Instead, the Court was careful to point out that the lower court must consider all of the statutory factors applicable to termination proceedings and that the applicable standard is the best interests of the child. See id. at 482-83, 365 A.2d at 523. The evidence in the present case related to all of the § 5540 factors, and the court was clear that the lodestar criterion was § 5540(3), "[t]he likelihood that the natural parent will be able to resume his [or her] parental duties within a reasonable period of time." Moreover, the Court in J. & J.W. spelled out strong evidence supporting mother's readiness for resumption of parental dutiesdivorce from an assaultive husband, establishment of a stable marital situation, treatment for and remission of her mental illness, and employment in a part-time position which in part involved supervision of children. See id. at 484-85, 365 A.2d at 524. Though comparisons between lives is a difficult undertaking, we cannot say that, in this case, the court's guarded and limited findings about mother's personal progress rose to the level of the evidence discussed in J. & J.W. There was no error.
Affirmed.
NOTES
[*] 33 V.S.A. § 5540 states in relevant part:

[A]ny time a petition is filed by the department of social and rehabilitation services for custody of a minor without limitation as to adoption, the court shall consider the best interests of the child in accordance with the following:
(1) The interaction and interrelationship of the child with his natural parents, his foster parents if any, his siblings, and any other person who may significantly affect the child's best interests;
(2) The child's adjustment to his home, school, and community;
(3) The likelihood that the natural parent will be able to resume his parental duties within a reasonable period of time; and
(4) Whether the natural parent has played and continues to play a constructive role, including personal contact and demonstrated love and affection, in the child's welfare.