*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-013

APRIL TERM, 2014

| | |
|---|---|
| In re A.M., Juvenile | }    APPEALED FROM: |
| | } |
| | }    Superior Court, Chittenden Unit, |
| | }    Family Division |
| | } |
| | }    DOCKET NO. 376-12-12 Cnjv |

Trial Judge: Linda Levitt

In the above-entitled cause, the Clerk will enter:

Father appeals from the termination of his parental rights to his daughter, A.M., born in December 2012. Father argues that the court's finding that father will not be able to parent within a reasonable period of time is not supported by the evidence and the court's findings on father's contact with A.M. misapprehend the record. We affirm.

Mother has a history of drug addiction, mental health problems, criminal activity and homelessness. At birth, A.M. experienced withdrawal symptoms due to mother's use of drugs during her pregnancy. After birth, the Department for Children and Families (DCF) initially placed A.M. with father's sister and filed a petition to have A.M. declared a child in need of care or supervision (CHINS). Mother stipulated that A.M. was CHINS in January 2013, and father did so later. The placement with father's sister lasted only a few weeks, and then A.M. was placed in a foster home where she has remained since late December 2012.

Father has a long history of drug addiction and crime. He began using drugs at age twelve. He had twenty-four convictions from 1993 to 2013 and an array of correctional rule violations from his time in jail. He has four other children, and his parental rights to all of those children have been terminated. When A.M. was born, father was incarcerated on charges of escape and driving while under the influence. The initial disposition had concurrent goals of reunification with mother and adoption. Father was required to complete programs on parenting, anger and drugs. He was released in September 2013 and placed on furlough status. Father is classified as a high-risk violent offender and receives the highest level of supervision from the Department of Corrections. Father will be supervised until 2025 and has a poor history of complying with furlough agreements. Father had three visits with A.M. while in jail. After his release, he visited with A.M. in the DCF office. He has not engaged in any activities with A.M. outside a supervised setting. At the time of the final hearing, father had been drug-free since his release from jail, and had been in counseling for five weeks. He was living with a pastor and saving money for an apartment.

A.M.'s attorney and guardian moved to terminate parental rights to A.M. and the State joined the petition. Following a hearing, the court issued a written order. The court found that parents' progress had stagnated. As to father, the court found that father's ability to parent had stagnated insofar as he did not have a close relationship with A.M. and visits with father were

stressful for A.M. The court also found that father's recent lifestyle changes were too short-lived to demonstrate that they were sustainable and that he could provide a stable, loving home for A.M. The court also found that termination was in A.M.'s best interests explaining, that, among other reasons, father would not be able to parent A.M. within a reasonable period of time. Father appealed.

To terminate parental rights, the court must determine by clear and convincing evidence first that there is a change of circumstances, and second that termination is in the child's best interests. See 33 V.S.A. § 5113(b); In re B.W., 162 Vt. 287, 291 (1994). In assessing the child's best interests, the court must consider the statutory criteria. 33 V.S.A. § 5114. The most important factor is whether the parent will be able to resume parenting duties within a reasonable period of time. In re J.B., 167 Vt. 637, 639 (1998) (mem.). On appeal, we will uphold the family court's conclusions if supported by the findings and affirm the findings unless clearly erroneous. Id.

Father first argues that the family division's finding that he will not be able to parent within a reasonable period of time is not supported by the evidence. Father's argument revolves around the court's finding that it was not reasonable for A.M. to wait "a year or more to see if father could responsibly care for her." Father claims that this finding is not supported by the evidence, which was that it may take eight months to a year—not a year or more—to see if father could achieve stability and care for his daughter. Father argues also that the evidence indicated A.M. could wait for four months to achieve permanency and therefore it was premature to determine that father would not be able to parent within a reasonable period of time.

There was no error. The testimony father points to came from A.M.'s DCF social worker, who testified that she would like to see father maintain stability for "eight months to year minimum" before father could assume parenting A.M. This evidence is not at odds with the court's finding that A.M. would have to wait "a year or more" for father to attain the necessary permanency to parent her. The social worker's testimony was not the only evidence regarding father's readiness to parent. There was also evidence of father's long-standing history of drug abuse, criminal behavior and failure to comply with furlough conditions. It was not error for the court to find based on that evidence combined with the social worker's testimony that father would require "a year or more" to make the necessary lifestyle changes that would allow him to parent A.M.

Whether it would take father eight months, one year, or more to achieve goals necessary to begin parenting A.M., the court's other findings indicate that all of those times were too long when measured from A.M.'s perspective. See In re B.S., 166 Vt. 345, 353 (1997) ("The period of time must be viewed from the perspective of the needs of the child."). The court found that given A.M.'s young age, she needed permanency as soon as possible. Moreover, while father claims that termination was premature because the DCF social worker testified that A.M. could wait for four months, there was no evidence father would be ready in four months. More importantly, the court did not accept that A.M. could wait for four months. To the contrary, the court found that A.M. required permanency as soon as possible, and father would not be able to parent in a reasonable time.

Father next argues that the court's findings regarding father-child contact seriously misapprehend the record. Father points to two findings in particular. The first is the court's finding that father had three visits with A.M. while incarcerated and A.M. "reacted negatively to the visits becoming exhausted afterwards." Father claims that the evidence indicated the first

2

two visits went well and only the third went badly and caused A.M. to become exhausted. The second is the court's finding that A.M. "experiences visits with father as stressful. Even after the best visits, [A.M.] is exhausted." Father argues that this falsely indicates that there was deterioration in visits after improvement when the evidence indicated that all recent visits went well.

The social worker's testimony that A.M. would fall asleep immediately after visits and the foster mother's testimony that A.M. was tired after visits support the court's finding that A.M. was exhausted after visits. The court's recitation that A.M. "reacted negatively" to the prison visits is also consistent with the evidence insofar as the testimony indicated that the third visit did not go well and A.M. cried inconsolably for some time afterwards.

We disagree with father's statement that the implication of the court's finding that A.M. experiences visits as stressful incorrectly implies that the visits were not improving. The court acknowledged that since father's release from prison he has visited with A.M. regularly, his visits have improved, and he acts appropriately with her. Nonetheless, the court found that A.M. was exhausted after visits and the visits were stressful. As explained above, the evidence supports that the visits tired A.M. and it was not error to the court to infer from A.M.'s exhaustion that the visits caused A.M. stress.

To the extent the court's findings were inconsistent with the evidence—either because the visits were not "stressful" or because A.M. did not react negatively to <u>all</u> of the prison visits, neither of these errors require reversal. The court's decision did not hinge on either of these particular findings. See <u>In re A.F.</u>, 160 Vt. 175, 178 (1993) (affirming termination where supported findings were sufficient to sustain decision). The evidence supported the court's findings that father has a minimal role in A.M.'s life, that father's contact with A.M. was for limited periods of time in a supervised setting, that father does not have a close relationship with A.M., that A.M. was well-adjusted to her current home, that A.M. required permanency, that father had not demonstrated that he could sustainably lead a drug- and crime-free life, and that father could not begin parenting within a reasonable period of time. These findings all support the court's termination decision.

<u>Affirmed</u>.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Marilyn S. Skoglund, Associate Justice

3