*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2015-166

SEPTEMBER TERM, 2015

| | |
|---|---|
| In re C.A. and S.A., Juveniles | } APPEALED FROM: |
| | } |
| | } Superior Court, Orleans Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 66/67-10-13 Osjv |

Trial Judge: M. Kathleen Manley

In the above-entitled cause, the Clerk will enter:

Mother and father appeal from the trial court's order terminating their residual parental rights in C.A. and S.A. We affirm.

C.A. was born in December 2007; S.A. was born in November 2010. C.A. had a stroke shortly after his birth and was fairly nonverbal. The Department for Children and Families (DCF) became involved with the family in the spring of 2013 after numerous calls and interventions by law enforcement. In October 2013, DCF filed a petition alleging that the children were in need of care or supervision (CHINS). The children were taken into DCF custody in February 2014, on the second day of the CHINS merits hearing and placed in their paternal grandmother's care. The court adjudicated the children as CHINS in April 2014 based on numerous findings, including chronic neglect, violence in the home, and parents' failure to meet the children's special needs. In September 2014, DCF moved to terminate parents' residual rights. Following a hearing, the court granted its request.

The court made the following findings. Law enforcement officials were involved with the family between 2012 and 2013, and responded to the family's home on at least six occasions. Most of the calls were in the nature of a family disturbance due to father's mental health issues. In July 2013, an officer observed mother run out of the apartment screaming with father in pursuit with a sword. Police described the family's home as filthy with an "overwhelming stench" caused by rotting food, dirty dishes, and an unclean floor. The children were "filthy" as well. During another police response, an officer observed a young child in a small dog kennel on the back side of the apartment building. Mother told the officer that it was not uncommon for her to place a child in the kennel while she remained in the apartment.

As indicated above, the court found that father has longstanding serious mental health challenges that require ongoing medications without which father becomes delusional and violent. Mother assisted father in taking his prescribed medications, but she indicated that the medications interfered with father's libido and at times, he did not take them for this reason. Mother also has mental health challenges that have a negative impact on her interactions with others.

During the pendency of these proceedings, father was in the Brattleboro Retreat because of a threatening and dangerous interaction with mother. After his discharge, father began living in a specialized home. In December 2013, he was incarcerated in New Hampshire on a felony assault charge on mother after he struck her in the face with a sword caused an injury requiring nine stitches. Mother attributed the stabbing to father being on the wrong medication, rather than his failure to routinely take prescribed medications. Father was released at some unknown date when the charges were dismissed, and he was hospitalized in the New Hampshire State Hospital. Father believed that he was released from that hospital in the fall of 2014. DCF did not learn of his release until October 2014 when mother advised DCF that she had moved into an apartment with father in New Hampshire.

In the meantime, a disposition case plan had been prepared in May 2014 recommending continued DCF custody with a concurrent goal of reunification with mother or adoption. The case plan did not recommend reunification with father and specifically stated that DCF did not support his return to the family. Mother agreed to the plan; father did not offer any objections to it.

The children had been living with their paternal grandmother since October 2013, and the court found that they had made good progress in her care, particularly C.A. Grandmother arranged all of the children's appointments, and transported them. In contrast to parents, she also worked closely with the school and other service providers to follow through with treatment suggestions.

Mother had visitation with the children with the assistance of Family Time Coaching (FTC). Mother needed a large amount of time to focus on the purpose of the FTC; she tended to focus on other topics and was not easily redirected. Mother was overwhelmed when she had visitation with both children. She could not keep her attention on both children or manage her emotions. Mother was afraid of C.A. and did not want to be physically close to him. Mother also had unrealistic expectations as to what the children were developmentally capable of doing and repeatedly asked the FTC staff to teach the children how to behave. Mother was highly resistant to suggestions from the FTC staff, arguing each point and insisting that she knew best. Even after nine months of assisted visitation, mother could not consistently focus on the children or effectively manage their behaviors. The court found that mother's unmet mental health needs directly interfered with her ability to engage in meaningful interactions with others necessary to provide services to the children. Mother blamed others for causing the issues identified by DCF.

After his release from the New Hampshire State Hospital in October 2014, parents lived together, and the court found that, by all accounts, father was currently stabilized on his most recent medications. He had not experienced any violent episodes since he began his medication regime. He engaged in counseling, obtained his medication, and was involved in vocational rehabilitation. He paid his own bills and supported himself through SSI. His memory was fuzzy as to why certain things occurred, such as the various interactions with law enforcement while the children were in parents' custody or what special needs the children had. He thought the children might be dyslexic because he had dyslexia. The court found that father clearly loved the children and expressed wanting to see them.

Based on these and other findings, the court concluded that there had been a change of circumstances in light of mother's minimal progress in addressing the case plan goals. It noted,

among other things, that C.A. had significant needs that had not been adequately met until he was removed from parents' home. C.A. was seven years old and had only just begun to perform basic skills such as using utensils to eat, playing with toys, and interacting with other children. The court found that in some measure, these significant delays were due to the chaotic environment in which he lived. C.A. had made steady progress since being placed in his grandmother's care and provided access to the educational and support services that he needed. Mother failed to demonstrate the skills necessary to care for the children in an emotionally safe manner that assured that the children would continue to live in a stable environment with the ability to access the services they needed. Mother knew, moreover, that father was not part of a reunification plan but nonetheless resumed living with him after his release from the hospital. More significantly, the court found that, even with supports, mother was overwhelmed when both children attended Family Time Coaching together and could not effectively manage their behaviors. Mother also failed to attend or participate in the children's appointments and instead continued to blame the education system for failing to adequately address the children's needs.

Turning to the statutory best-interest factors, the court first described the children's interactions with others, including parents. It found that the children had been living with grandmother for over a year during which time they developed a routine, had stable housing, and stable care. The children seemed well-adjusted to living with grandmother. They regularly attended school, and were developing basic skills. The children had weekly contact with mother. The court found it was unclear how much, if any, contact the children had with father even before this action started. He was incarcerated or hospitalized for almost a year during the pendency of this action and prior to that, he had been in and out of hospitals and/or specialized homes. During the pendency of this action, he posed a physical danger to both the children and mother because of his serious mental health issues that caused psychosis when not effectively treated with medications. While the court recognized that father loved the children, it found no reliable evidence about the nature of their connection to him, if any.

The court found no likelihood that either parent could assume or resume parental duties within a reasonable time. With respect to father, he had been out of the hospital for about four months during which time he had been stable. Father's life seemed to have stabilized for the moment in that he had housing located for him by the local mental health agency, his home was close to his counseling services, he engaged in counseling, and received medications regularly. Father was also working on his relationship with mother through couples' counseling. Father was engaged in vocational rehabilitation and appeared to be doing the things necessary to regulate his moods, care for himself, and remain safe. The court found that all of these things were excellent initial steps because they supported father in his efforts to maintain himself safely. In time, these steps might lend themselves to assisting father to reengage with the children. That said, however, the court found that it would be quite some time, if ever, before father could safely assume an active day-to-day role in parenting the children. Their needs were great, they were young, and father's stability was new.

As to mother, the court found that she had made progress in addressing her fear of C.A. which might allow her in the future to build on her relationship with him and S.A. Mother's mental health issues remained, however, which directly interfered with her ability to interact appropriately with service providers for the children, among others. Mother did not recognize the need for intensive services for the children or ensure that the children received those services because she focused on perceived slights or disagreements with the providers' opinions. Until

3

mother's mental health struggles were effectively addressed, this dynamic would not change, and it would not change within a reasonable time particularly in light of the children's needs.

Finally, the court found that mother played a role in the children's lives but it was difficult to say in what way. The evidence showed that when mother could focus on one child, engage in a specific activity with that child, and not get derailed by some extraneous issue, the child enjoyed that activity, engaged with mother and smiled. When that happened, it was a positive interaction. The court found that it was not known what role, if any, father had played in the children's lives for over two years because his circumstances prevented him from engaging with the children at most levels. Given the length of time that father lived away from the children, the court was unable to find any evidence of his playing an ongoing constructive role in their lives. The court thus found by clear and convincing evidence that termination of parents' residual rights was in the children's best interests without limitation to adoption. This appeal followed.

Mother argues that in reaching its decision, the court failed to adequately assess two of the statutory best-interest factors: the children's "interaction and interrelationship" with her and whether she "has played and continues to play a constructive role, including personal contact and demonstrated emotional support and affection, in the child's welfare." 33 V.S.A. § 5114(a)(1), (4). According to mother, DCF failed to provide sufficient evidence on these points, and the court failed to describe the current state of her relationship with the children or characterize the role that she plays in their lives.

To determine if termination of a parent's rights is in a child's best interests, the court must consider four statutory factors. See 33 V.S.A. § 5114(a). The most important factor is the likelihood that the parent will be able to resume his or her parental duties within a reasonable period of time. See In re B.M., 165 Vt. 331, 336 (1996). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.).

Mother does not contest the court's conclusion that she could not parent the children within a reasonable period of time, the most significant statutory factor. We reject her challenges to the court's assessment of the two statutory best-interest factors cited above. The court made numerous findings concerning mother's interaction and interrelationship with the children. As set forth above, while the children were living with mother, they were dirty, and their home was filthy. At one point, mother moved the children into an unheated camper without running water or functioning bathroom facilities. Mother did not work with service providers or school personnel to ensure that the children's special needs were being addressed. The children's home life was chaotic, and law enforcement frequently visited the home. Mother thought it was appropriate to place the children in a dog kennel. After the children came into DCF custody, mother struggled during visitation to remain focused on the children. After nine months of assisted visitation, mother still could not consistently focus on the children or effectively manage their behaviors. She could not engage with or handle both children at visits. Mother was afraid of C.A., although she made progress on this point. Mother did not understand what the children were developmentally capable of doing. Mother's unmet mental health needs extensively interfered with her ability to interact with necessary service providers for the children. She also failed to attend or participate in the children's appointments set up by the

4

children's grandmother. Both the evidence and the court's findings as to mother's interaction and interrelationship with the children are sufficient here.

As to the question of whether mother played a constructive role in the children's lives, the court stated in its decision that it was difficult to characterize her role. If she could focus on one child, the court explained, the child enjoyed that activity and smiled. As is evident from the findings above, however, mother could not consistently maintain this focus, and she could not manage both children in the same room during visitation. The court made numerous additional findings that bear on mother's role in the children's lives, which are recounted above. She allowed the children to live in filth while they were in her custody; she did not ensure that C.A. attended school; and she did not ensure that their basic needs or special needs were met; she put them in an outside dog kennel. As the court explained in reaching its decision, both children had developmental delays, and their needs were not adequately met until they were removed from mother's care. The evidence and the court's findings are adequate to show that it applied the appropriate standard in reaching its decision, and we find no basis for reversal.

We turn next to father's arguments. Father complains that the court heard very little evidence about his condition after he was treated and medicated for his mental illness. Given the court's findings that he was currently stabilized, however, father maintains that the court had to conclude that he could assume parenting responsibilities within a reasonable period of time. He cites In re M.B. 162 Vt. 229, 235 (1994), arguing that the court had to find that he was presently unfit to care for the children and that he would not be fit to care for them within a reasonable period of time. Father suggests that DCF failed to communicate with him or otherwise work with him, which led to DCF being unable to present evidence as to his ability to assume parenting responsibilities. Father also challenges the court's assessment of whether he played a constructive role in the children's lives. He contends that the State failed to produce sufficient evidence on this point, and that the court impermissibly shifted the State's burden to him.

We reject these arguments. As set forth above, the court recognized that father was currently stabilized on his most recent medications. He was living in an apartment near his psychiatric providers, engaged in counseling, obtaining his medication, and involved in vocational rehabilitation. Nonetheless, it reasonably considered father's history of violent and delusional behavior and longstanding mental health issues, and concluded that this short period of stability was insufficient to show that father could assume parenting duties within a reasonable period of time. While father had made excellent initial steps, the court concluded that it would be a long time, if ever, before father could safely assume an active day-to-day role in parenting the children. To the extent that In re M.B. requires a finding of present unfitness, although there is no specific language to that effect in the citation provided by father, the court clearly found father incapable of parenting the children at the time of its decision for the reasons above. The fact that father had made progress does not mean that he is prepared to assume parental responsibilities immediately or within a reasonable period of time. See In re J.B., 167 Vt. 637, 640 (1998) (mem.) (rejecting argument that court may not terminate parental rights if the parent has made progress); In re A.F., 160 Vt. 175, 181-82 (1993) (concluding that although parent had made progress in parenting skills, trial court's finding that parent would not be able to resume parenting within a reasonable time was supported by the evidence and not erroneous). The court had sufficient evidence to reach the conclusion that it did.

Father suggests that DCF's failure to engage with him left DCF with insufficient evidence regarding his ability to resume parenting. We reject the premise of father's argument.

5

As indicated above, the evidence presented here was sufficient to support the court's conclusion. We note that DCF never considered reunification of the children with father, and it did not support father's return to the family. It did provide a plan of services for father, however, in the May 2014 disposition plan. However, father was hospitalized or incarcerated during much of the period that the children were in DCF custody. Prior to that time, he was a violent and dangerous presence in the home. He, like mother, allowed the children to live in filth. He was the cause of numerous visits by law enforcement, and he, like mother, created a chaotic living environment to the children's detriment. These findings all have a bearing on father's ability to assume parenting responsibilities, notwithstanding father's four months of stability. We find no error in the court's assessment of this statutory factor.

The court similarly did not err in assessing whether father played a constructive role in the children's lives. The court found that for over two years, father's circumstances has prevented him from engaging with the children. Father was hospitalized, incarcerated, and hospitalized again during this period. It was father's absence that resulted in the court's inability to find that he played an ongoing constructive role in the children's lives, not any failure of proof on DCF's behalf. The court did not engage in burden shifting, but merely commented on the state of the evidence. We find no error in the court's decision.

Affirmed.

BY THE COURT:

_____
John A. Dooley, Associate Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice

6