*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2019-349

FEBRUARY TERM, 2020

| | |
|---|---|
| In re B.A., Juvenile (D.A., Mother*) | } APPEALED FROM: |
| | } |
| | } Superior Court, Chittenden Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 142-4-17 Cnjv |

Trial Judge: Thomas J. Devine

In the above-entitled cause, the Clerk will enter:

Mother appeals termination of her parental rights to her son B.A., born in April 2017. On appeal, mother argues that (1) the court erred in concluding there was a change of circumstances because any lack of progress was due to factors beyond her control, (2) the court failed to give her notice of the progress she was supposed to make, and (3) the court's finding regarding the effect of mother's emotional dysregulation on B.A. was not supported by the evidence. We affirm.

The court made the following findings. Mother has a history of housing instability, homelessness, and cocaine and marijuana use. Mother has been diagnosed with anxiety, post-traumatic stress disorder (PTSD), emphysema, and chronic obstructive pulmonary disease. Mother also has mental-health issues, which cause episodes of emotional dysregulation. During such episodes, mother becomes hostile and her behavior escalates rapidly into yelling, clenching teeth, throwing things, and clenching fists. Mother has four older children and her rights to these children have previously been terminated.

A day after B.A. was born, the State filed a petition alleging that he was a child in need of care or supervision (CHINS). The court issued an emergency order placing B.A. in the custody of the Department for Children and Families (DCF). At four days old, B.A. was placed with a foster family where he has lived since.

Mother stipulated that B.A. was CHINS in June 2017.[1] She acknowledged that she needed time to work on her emotional regulation. The court adopted a case plan with concurrent goals of reunification or adoption. The disposition order, to which mother agreed, recommended that mother continue to engage in therapy to address better self-regulation and that she complete a parenting evaluation.

A licensed psychologist conducted an evaluation of mother's parenting capacity. The report noted that mother had made significant progress in many areas, including housing, being

---

[1] Father voluntarily relinquished his parental rights and has not appealed. Therefore, we do not discuss the facts relative to father.

abstinent from marijuana and crack cocaine use, and attending therapy. Although the psychologist observed love and affection between mother and B.A., she was concerned about mother's overly optimistic view of her parenting ability and mother's lack of appreciation of the magnitude of her mental-health challenges. The psychologist noted that parental dysregulation can cause children to become anxious and that episodes can interfere with attachment and bonding. The psychologist recommended at least six months of continued services and expanded visits, including visits in the community.

Mother's visits included Family Time coaching through Easter Seals. This program provides individualized parent education through coaching meetings before and after visits. The coach reported that mother had strong attendance at visits and acted affectionately; however, mother had difficultly appreciating B.A.'s developmental capabilities. She had unrealistic expectations of his motor and language skills and emotional maturity. She became frustrated and distracted and made sarcastic comments. She also struggled to accept feedback. If she perceived that feedback was a personal criticism, she cursed, clenched her fists, raised her voice, slammed things, and threw toys. B.A. was visibly affected by mother's response and became subdued. Mother also became angry when the coach asked her to comply with a doctor's request to wear clean, smoke-free clothing to visits because of B.A.'s asthma. As an accommodation, the coach allowed mother to step out or take breaks and to leave early if mother was unable to handle feedback after a visit. Mother stated that she did not find the pre-visit meetings productive. She was also resistant to writing a self-assessment.

In spring 2018, based on the recommendation from the parenting evaluation, visits between mother and B.A. began occurring in the community and mother's home. Mother continued to escalate in these settings. In April 2018, during a home visit, mother became angry and abruptly handed B.A. to the DCF worker. B.A. was visibly upset by mother's actions. In May 2018, at a grocery store where mother and B.A. were shopping, mother bumped into another shopper and then became escalated and swore at the store clerk. During other home visits, mother became upset and threw things. There were other incidents which made it difficult to find DCF case aides willing to work with mother. After a post-disposition review hearing in August 2018, the court agreed to extend the timeframe for achieving the case plan until November 2018. In September 2018, a DCF case aide observed a photograph of her young son displayed in mother's apartment, even though the aide had not provided mother with pictures of her child. A supervisor was called and arrived with a police officer. Mother became agitated, used profanity, and told everyone to leave her home. After this, visits took place at the DCF office.[2]

In November 2018, DCF filed petitions to terminate the parents' rights. Following a hearing, the court concluded that there was a change of circumstances based on mother's stagnation. The court found that although mother had completed a program, attended individual counseling, and maintained good attendance at visits, she had not yet demonstrated that she could maintain safe care of B.A. without supervision. Her therapy had resulted in some progress, but mother continued to have significant episodes despite two or more years of therapy. She raised her voice, swore, slammed and threw things, and was resistant to feedback. The displays were harmful to B.A.

The court also concluded that termination was in B.A.'s best interests. B.A. had a strong relationship with his foster parents and extended family. He was well adjusted to his home, school, and community. Although mother and B.A. have a bond of love and affection, mother's dysregulation caused B.A. harm and interfered with her ability to focus on his needs. The court

---

[2] After a hearing, the court denied mother's request for unsupervised visits.

determined that mother would not be able to parent within a reasonable time. Despite therapy, mother's struggles with self-regulation were significant and ongoing and she could not provide safe care for B.A. outside of a supervised setting. Mother appeals.

When the termination of parental rights is sought after the initial disposition, the trial court must conduct a two-step analysis. In re B.W., 162 Vt. 287, 291 (1994). The court must first find that there has been a change in circumstances. 33 V.S.A. § 5113(b). Second, the court must find that termination of parental rights is in the child's best interests. Id. § 5114(a). In assessing the child's best interests, the court is guided by statutory criteria. Id. The most important factor is whether the parent will be able to resume parenting duties within a reasonable period of time. In re J.B., 167 Vt. 637, 639 (1998) (mem.).

On appeal, mother argues that the court abused its discretion in concluding that mother's progress had stagnated because its decision stemmed from mother's inability to regulate her emotions, which she asserts was a factor beyond her control. Stagnation occurs when a parent's ability to care for a child does not improve "within a reasonable time after the CHINS adjudication." In re D.B., 161 Vt. 217, 219 (1993). Even where a parent's general parenting skills have improved, stagnation may occur if it is unlikely that the parent will be able to resume parental duties within a reasonable time. Id. at 220.

We conclude there was no error. The court determined that mother's progress stagnated because despite therapy, mother continued to escalate at visits and to exhibit harmful behavior that affected B.A. and prevented mother from progressing to overnight visits. Mother points to no evidence in the record or finding by the court to support her assertion that her lack of progress in controlling her emotions was due to "an innate, immutable part of her identity as a person with a disability." Although the court found that mother had mental-health issues, the court did not find that mother's emotional dysregulation was immutable, or that mother could not alter her responses. To the contrary, from the outset of the case, the parties and the court expected that mother would be able to improve her behavior. The forensic psychologist testified that she was focused not on mother's mental-health diagnosis but on mother's behavior, regardless of whether it was the result of a disorder. Further, the court's findings indicate that mother did have the ability to improve. The court found that mother was making some improvement in her self-regulation skills, but that additional progress was necessary to safely parent B.A.

Mother next argues that essentially the court determined that mother required full-time parenting support and that she did not have notice of this expectation. We conclude that there was no error. First, mother's portrayal of the court's findings is not accurate. The court did not determine that mother's ability to reunite was dependent on her obtaining full-time support. The court found that mother would not be able to parent within a reasonable time because her "struggles with self-regulation remain significant and ongoing." The court explained that in a supervised setting, mother could take a break or leave B.A. with another adult, but that if she were the full-time parent, she would not have those options. Nor would she have the option of "cancelling care if she feels volatile that day." In responding to mother's assertion that grandmother was nearby and could assist mother, the court found that grandmother was not "capable of constant supervision when mother loses control." This did not amount to a finding that mother was required to obtain full-time support before reunification could happen. Second, mother had full notice of the expectations in the case plan and agreed with the goals. The disposition plan envisioned mother becoming able to provide full-time care to B.A. and the services provided were designed to assist mother in attaining that goal. The court did not err in concluding that despite these services, mother failed to make progress in her ability to care for B.A.

Finally, mother argues that the evidence does not support the court's findings that her emotional dysregulation prevented her from resuming her parental responsibilities. Mother asserts that the evidence demonstrated only that emotional dysregulation created a risk of causing anxiety in children and interfering with attachment, but there was no evidence of such disruption in this case. On appeal, we will uphold the family court's conclusions if supported by the findings and affirm the findings unless clearly erroneous. In re A.F., 160 Vt. 175, 178 (1993). Here, there was sufficient evidence to support the court's findings that mother's dysregulation threatened the bond with B.A. and prevented her from safely parenting. The psychologist testified regarding the risk that mother's dysregulation presented to B.A. The Family Time coach testified that mother's escalation impacted B.A.'s safety and impeded her ability to read his emotional cues. She also testified that B.A. is visibly affected by mother's outbursts. Moreover, this finding is not inconsistent with the court's observation that a bond between mother and B.A. continued to exist.

There is no basis for mother's argument that the court erred in terminating her rights based solely on a perceived risk of a disrupted attachment. The court found that mother's escalation had a direct effect on B.A. The episodes presented a safety risk for B.A., were frightening to B.A., and made mother unavailable to B.A. Moreover, termination was based on the court's evaluation of all the best-interests factors. The court found that mother's ability to parent would not improve within a reasonable time. The court also found that B.A. had a strong bond with his foster family and was well adjusted to his current home and community. These findings support the court's conclusion that termination was in B.A.'s best interests.

Affirmed.

BY THE COURT:

Harold E. Eaton, Jr., Associate Justice


Karen R. Carroll, Associate Justice


William D. Cohen, Associate Justice