VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.    23-AP-329



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

MARCH TERM,   2024

| | |
|---|---|
| In re A.B., Juvenile<br>(J.D., Mother\*) | APPEALED FROM:<br><br>Superior Court, Windham Unit,<br>Family Division<br>CASE NO. 21-JV-00787<br>Trial Judge: Robert R. Bent (Ret.) |

In the above-entitled cause, the Clerk will enter:

Mother appeals the termination of her parental rights to three-year-old daughter A.B.  We affirm.

The Department for Children and Families (DCF) began offering services to mother in October 2020 after a report that mother was using drugs during her pregnancy and had been arrested.  Mother's parental rights to two older children were terminated in an earlier proceeding and mother had an extensive history of heroin use.  During a scheduled home visit in May 2021, a DCF worker observed that mother and husband appeared to be under the influence of drugs. Mother admitted to DCF that she had recently used heroin and cocaine.  The State filed a petition alleging that A.B. was a child in need of care or supervision (CHINS) in June 2021, and the court transferred custody of A.B. to DCF in a temporary care order.

In November 2021, the court found for the State on the merits of the CHINS petition. Specifically, it found that mother was under the influence of heroin while caring for A.B. and that A.B. was present when mother and husband overdosed.  The court subsequently issued a disposition order continuing DCF custody and establishing a permanency goal of reunification with mother or her husband by May 2022.[1]  The case plan adopted by the court called for mother to participate in mental-health and substance-abuse treatment, submit to drug screening as requested by DCF, create a relapse prevention plan, attend weekly therapy sessions, maintain sobriety for at least four months, keep her household free of unprescribed drugs and paraphernalia, access supports for domestic violence, identify and change at least three parts of her lifestyle to avoid the risk of reoffending, refrain from engaging in criminal activity, and

---

[1] Husband filed a voluntary acknowledgment of paternity at the outset of the case.  After genetic testing, in June 2022 the court determined that husband was not A.B.'s biological or de facto father.  A.B.'s biological father's rights were terminated in a May 2023 order, which he did not appeal.

engage in parent education through the Lund Residential Program or another program approved by DCF.

In June 2022, DCF filed a petition to terminate mother's parental rights to A.B. The court held a hearing on the petition over two days in May and August 2023. It subsequently issued a written order containing the following findings.

After A.B. was placed in DCF custody, mother completed an outpatient rehabilitation program at Valley Vista. Her condition seemed to stabilize and she attended scheduled visits with A.B. during the summer and fall of 2021. In October 2021, however, mother relapsed. Both she and husband were actively using drugs and they did not have stable housing. Mother developed endocarditis, an infection of the heart. She underwent surgery in February 2022 to debride her heart valve. She was advised that she would need further surgery to repair her heart valve and would need to be sober for at least six months prior to the surgery.

During this period mother did not make much progress toward reunification. DCF recommended mother participate in the Lund program, where she would have a place to live with A.B. and could engage in substance-abuse and mental-health treatment. Mother began an application to Lund after her surgery but did not complete it until April 2022. Mother attended Valley Vista a second time in March 2022.

Mother's entry into the Lund program was delayed because Lund staff wanted mother to undergo her recommended heart surgery before she enrolled. In turn, the hospital recommended that mother undergo dental surgery before having the heart procedure. Mother spent the summer of 2022 attempting to arrange dental treatment, but was unsuccessful.

Between June 2022 and May 2023, mother lived with her family. DCF did not consider this to be an appropriate residence for A.B., in part because an overdose death occurred there in August 2022. Mother continued to have supervised visits twice a week with A.B. during this time. Mother and A.B. were bonded and A.B. looked to her mother to meet her needs during visits, even though A.B. had not lived with mother for most of her life. A.B. also quickly bonded to other caregivers.

During Easter of 2023, mother overdosed on fentanyl in an attempt at suicide. She relapsed again in May 2023.

Mother was not employed during the CHINS proceeding, never applied for disability benefits, and did not have a driver's license. She remained on probation for a 2020 conviction for sale of heroin. Mother did complete a domestic-violence assessment, a parenting class, and a mental-health assessment, and began seeing a therapist in 2022. Mother was finally admitted to the Lund program in June 2023, despite her ongoing need for heart and dental surgery. DCF did not agree to have A.B. placed with mother. Lund staff testified that mother was making progress but were unable to predict how long mother would have to stay at Lund if A.B. were placed with her.

A.B. was initially placed with mother's sister when the CHINS proceeding began. She was moved to a foster home in November 2021. That placement ended in the summer of 2023, after the first day of the termination hearing, when DCF learned that A.B. had been with the foster mother during a drug transaction. A.B.'s new foster mother testified that A.B. was adjusting well to her home and that A.B. was already calling her "mom."

2

The court determined that mother had completed some steps recommended by the case plan, but her relapses in the spring of 2023 demonstrated that she had stagnated in her progress toward reunification. It assessed the criteria set forth in 33 V.S.A. § 5114(a) and determined that termination of parental rights was in A.B.'s best interests, primarily because it could not conclude that mother would be able to resume parental duties within a reasonable amount of time. Mother appealed.

When considering a petition to terminate parental rights after an initial disposition order, the court must first determine whether there has been a change in circumstances sufficient to justify modifying the existing disposition order. In re B.W., 162 Vt. 287, 291 (1994); 33 V.S.A. § 5113(b). If it finds a change in circumstances, the court must then consider whether termination is in the child's best interests using the factors set forth in 33 V.S.A. § 5114(a). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450.

On appeal, mother first argues that the court erred in finding that she had stagnated in her progress toward reunification. Mother asserts that the evidence showed she had completed almost every step required by the case plan and argues that relapses are to be expected as part of her recovery.

We have held that stagnation may be "found in cases in which parenting skills improve, yet the improvement is so insignificant that it is unlikely the parent will be able to resume parental duties in a reasonable time." In re D.M., 162 Vt. 33, 38 (1994). The family court essentially found such a situation to exist in this case. It acknowledged that mother had recently completed some of the steps required by the case plan: she had engaged in mental-health treatment, undergone a domestic-violence assessment, and finally enrolled in the Lund program. However, the court found that mother's progress had come late in the case and that her recent relapses indicated that she had not made the progress expected of her. As we have explained, the "fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of changed circumstances warranting modification of a previous disposition order." In re A.F., 160 Vt. 175, 181 (1993). Mother testified that she overdosed on fentanyl on Easter Monday of 2023 and used drugs at least three more times after the May 2023 hearing. This evidence demonstrates that mother had not made sufficient progress in addressing one of the primary issues that led to A.B. entering state custody, namely, her use of heroin and other unprescribed illegal substances. Although mother's condition appeared to stabilize once she entered the Lund program, it could take at least six months for her to be able to safely parent A.B. on a full-time basis. Mother's progress, though significant, came much later than anticipated. Given these circumstances, we see no error in the court's finding of stagnation. See In re B.M., 165 Vt. 331, 336 (1996) ("From the child's perspective, at least, the earlier period of stagnation is not necessarily wiped out by the later improvement."); see also In re D.M., 2004 VT 41, ¶ 7, 176 Vt. 639 (mem.) ("[E]ven if a parent participates in every program set forth in [the case] plan, the main concern must always be whether the individual parent has demonstrated the improvement contemplated at the time the children were removed from the parent's care.").

Mother further argues that the court erred in concluding that termination was in A.B.'s best interests because she and A.B. have a strong bond and A.B. did not have a potential permanent placement. We see no error. The court analyzed the statutory best-interests factors and found that "the most important factor," which is "the likelihood that the parent will be able to resume parental duties within a reasonable time," weighed in favor of termination. In re J.B.,

167 Vt. 637, 639 (1998) (mem.). The court's findings are supported by the evidence and in turn support its conclusion that termination was in A.B.'s best interests. As described above, the evidence showed that mother was not likely to be able to resume parenting any time soon. She had not progressed beyond supervised visits with A.B. or demonstrated an extended period of sobriety. She also had serious unaddressed health issues and lacked stable housing. The court acknowledged mother's bond with A.B. but found that it was outweighed by the uncertainty that mother would be able to resume parenting within a reasonable time. See In re M.B., 162 Vt. 229, 238 (1994) ("Public policy . . . does not dictate that the parent-child bond be maintained regardless of the cost to the child; [the CHINS statute] recognizes that severance of that bond may be in the child's best interest.").

We note that the evidence does not support mother's assertion that A.B. had no potential permanent placement. A.B.'s current foster mother testified that A.B. was adjusting well to her foster family and home and that she would be willing to adopt A.B. But even assuming A.B.'s permanent placement is uncertain, "we have repeatedly stated that a valid termination of parental rights does not depend on the availability of permanent foster care or adoption." In re S.B., 174 Vt. 427, 430 (2002) (mem.). We therefore see no reason to disturb the decision below.

Affirmed.

BY THE COURT:

Paul L. Reiber, Chief Justice

Harold E. Eaton, Jr., Associate Justice

Nancy J. Waples, Associate Justice

4