VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.    25-AP-132



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SEPTEMBER TERM,   2025

| | |
|---|---|
| In re A.M., Juvenile<br>(H.B., Mother\*) | APPEALED FROM:<br><br>Superior Court, Chittenden Unit,<br>Family Division<br>CASE NO. 21-JV-00092<br>Trial Judge: Michael J. Harris |

In the above-entitled cause, the Clerk will enter:

Mother appeals the termination of her parental rights to A.M., who is ten years old.  We affirm.

In January 2021, when A.M. was five, the State filed a petition alleging that he was a child in need of care or supervision (CHINS) due to concerns that mother was using fentanyl and her mental health appeared to be declining.  At the temporary-care hearing, the court issued a conditional-custody order (CCO) placing A.M. in the custody of mother and maternal grandmother.  In May 2021, mother stipulated to the merits of the CHINS petition.

After a contested disposition hearing, the court issued an order adopting a permanency goal of reunification with mother, and if that was not possible, with father.[1]  The case plan adopted by the court required mother to continue to engage in substance-abuse and mental-health treatment, refrain from using illicit unprescribed substances, undergo urinalysis and sign releases as requested by DCF, follow conditions and recommendations from the criminal court, and not display physical or verbal aggression toward others in A.M.'s presence.

In August 2022, the State notified the court that A.M. had ingested liquid methadone in mother's home and nearly died.  At an emergency hearing, the court issued a temporary order transferring custody to DCF.  The court held a contested temporary-care hearing in November 2022 and issued another order continuing DCF custody.  In December 2022, DCF filed a petition to terminate mother's rights to A.M.

---

[1]  At the time of the petition, father did not have legal custody of A.M.  Father was later substantiated by DCF for sexually abusing A.M.  Father's parental rights were terminated at the same time as mother's rights and he did not appeal.

The termination hearing was initially scheduled for July 2023 but was continued by the court, partly because of a discovery conflict between the parties. The hearing was eventually held over four days in May 2024 and January and February 2025. In April 2025, the court issued a written order granting the petition to terminate mother's rights.

The court found that during the initial phase of the case, when A.M. was in his maternal grandmother's care, mother continued to struggle with substance abuse, as evidenced by her own reports and multiple positive urinalyses. Mother's relationship with maternal grandmother deteriorated while they were living in the same home. In July 2021, mother became upset after maternal grandmother would not give her a ride and started yelling at maternal grandmother. While mother was holding A.M., mother pushed maternal grandmother to the ground, injuring her. Mother was charged with domestic assault and had to vacate maternal grandmother's home under the terms of a relief-from-abuse order. DCF substantiated mother for placing A.M. at risk of harm.

By early 2022, maternal grandmother wished to return to her home in Florida, and the parties agreed to place A.M. in the conditional custody of mother and mother's father. Mother continued to struggle with substance abuse and maternal grandfather allowed her to have unsupervised contact with A.M., in violation of the CCO. The CCO was amended to add A.M.'s maternal great-grandmother as a custodian to ensure mother's contact with A.M. was supervised at all times. In June 2022, the court lifted the requirement of supervised contact because mother had demonstrated sobriety for several months.

In the summer of 2022 mother participated in a substance-abuse treatment program. She was prescribed methadone and was allowed to take her doses home on a weekly basis. She was required to keep her methadone locked away. Without telling her provider, mother began taking less than a full dose of methadone and storing the leftover methadone in an unlabeled plastic water bottle. In August 2022, A.M. took a sip from the bottle and reported that the "water" tasted funny. He quickly became ill and mother called 911. A.M. was demonstrating signs of narcotic ingestion and required two doses of Narcan to be revived. When asked by first responders, mother initially denied that there were opiates in the home. She then admitted that she possessed prescribed narcotics but falsely stated that they were always locked up.

After this incident the court transferred custody to DCF. A.M. was placed in the care of maternal great-grandmother. Mother had supervised visits with A.M. twice a week. Mother continued to engage in substance-abuse treatment but her urinalyses in October and November 2022 tested positive for illicit drugs.

In December 2022, A.M. was placed in the care of his paternal aunt in Bethel, where he continued to reside at the time of the termination hearing. Mother regularly attended supervised visits with A.M. They often played video or board games together. Mother would become upset if A.M. was winning or she felt he was not following her instructions. Mother attended A.M.'s school and medical appointments and some school events. By December 2023 mother had shown sufficient compliance with her drug treatment program that DCF authorized unsupervised visits. A.M. expressed concern about these visits and after they began, he began to have angry outbursts and soiled his pants. A.M. saw a therapist during this time. By the time of the May 2024 termination hearing, mother was providing care for A.M. on weekends and visited him on Tuesdays. She had gradually tapered her methadone intake from a high of 70 mg to 30 mg per day.

In the month prior to the May 2024 hearing, however, mother began accusing DCF and her family members of abusing A.M. She sent over 100 communications to DCF alleging that she and A.M. had been mistreated. DCF investigated specific items of concern that mother reported, such as a shin bruise, but did not find anything that warranted further action. Mother also began sending accusatory emails to A.M.'s school about DCF and her family. She reported the alleged abuse to the Colchester police, which did not find her allegations to be credible. Mother reported that people were trying to kill A.M. and that his entire school class or basketball team were being "trafficked." She accused her DCF caseworker of being a pedophile. Mother's behavior eventually led to her being involuntarily hospitalized for approximately four days. The court subsequently granted a protective order prohibiting mother from contacting A.M. except for supervised contact, which resumed in July 2024. The protective order was later vacated but mother refused to sign releases for DCF regarding her hospitalization.

The court found insufficient evidence that maternal grandmother or grandfather, father's relatives, DCF personnel, or school personnel had abused A.M. or put him at risk of harm. The court further found that mother's refusal to allow DCF to access records from her involuntary hospitalization impeded DCF's ability to assess her current mental-health condition or know whether her providers had recommended treatment, making it difficult to assess future risks.

Mother continued to attend supervised visits with A.M. During an October 2024 visit, mother spoke about her mental-health conditions and raised her voice at A.M., telling him he had to believe her. During another visit, mother suddenly became loud and agitated after A.M. referred to his paternal grandmother. She made critical comments about father's family, said A.M. should not see them, and said everything was good until they took A.M. away from her. A.M. was very upset and later expressed his concerns to the DCF worker and his foster family about these statements. Mother continued to express her belief that A.M. was being abused and that the DCF worker was complicit.

The court found that at the time of the hearing, mother was compliant with her substance-abuse treatment program. She was prescribed medication for ADHD and anxiety from a psychiatrist but had not engaged in mental-health counseling since May 2024. She had maintained stable housing and employment and had taken some parenting classes.

After the events of May 2024, A.M. became adamant that he did not want to see mother more than once a week and did not want to live with her on a full-time basis. He had recently expressed a desire to live permanently with his paternal aunt, who was willing to adopt him.

The court found that mother had stagnated in her progress toward reunification and was unlikely to be able to resume a parental role within a reasonable time. The court found that despite mother's progress in some areas, she had not been able to maintain unsupervised contact and had twice been substantiated for putting A.M. at risk of harm. The court found that mother's recent behaviors showed that she had a limited ability to handle stressful situations or communicate effectively with others, or to acknowledge how her own actions had prolonged A.M.'s time in DCF custody. The court further noted that mother's mental-health status was uncertain, in part because she refused to share any information with DCF. The court expressed concern that mother's fear that A.M. was being abused might lead her to jump to unwarranted conclusions and make decisions that were harmful to A.M. The court also expressed concern that if granted sole custody, mother would cut off contact between A.M. and his other family members or his therapist, who played important roles in his life. The court concluded that this factor, balanced with the other statutory best-interests factors, weighed in favor of terminating mother's parental rights, and therefore granted the petition. This appeal followed.

3

When considering a petition to terminate parental rights after initial disposition, the family court must first determine whether there has been a change in circumstances sufficient to justify modification of the original disposition order. In re B.W., 162 Vt. 287, 291 (1994). "A change in circumstances is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re H.A., 153 Vt. 504, 515 (1990). If it finds a change in circumstances, the court must then consider whether termination is in the child's best interests in accordance with the factors set forth in 33 V.S.A. § 5114(a). "The most important factor for the court to consider is the likelihood that the parent will be able to resume parental duties within a reasonable time." In re J.B., 167 Vt. 637, 639 (1998) (mem.). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450 (quotation omitted).

On appeal, mother first argues that the court erred by failing to separately analyze stagnation and instead simply referring to its analysis of the resumption-of-parental-duties factor for the relevant findings on that point. Although we do not endorse the approach taken by the trial court, we are unpersuaded that it was reversible error. "This Court has never held that the absence of an explicit finding as to changed circumstances requires the reversal of a modification order," and as long as the trial court makes sufficient findings to support the changed-circumstances standard, "we will not reverse the trial court's disposition on a technicality." In re C.L., 151 Vt. 480, 482-83 (1989).

Here, the court explicitly found that there were changed circumstances in the form of parental stagnation. Its findings regarding the resumption-of-parental-duties factor and elsewhere in its decision were sufficient to support its conclusion that mother had stagnated by failing, over the four-year life of the proceeding, to demonstrate that she could safely care for A.M. on a consistent basis. The court recognized that mother had recently demonstrated a significant period of abstinence from drug use and had consistently attended visits with A.M. However, "the mere fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of changed circumstances warranting modification of a previous disposition order." In re A.F., 160 Vt. 175, 181 (1993). The court found that after the methadone-ingestion incident in 2022, mother eventually progressed to having unsupervised weekly contact with A.M. But her behavior in the spring of 2024, which led to her involuntary hospitalization, caused the court to again require supervised visits with A.M. and significantly damaged mother's relationship with him.[2] Mother refused to allow DCF access to information relevant to this serious episode, which made it difficult to assess her current mental-health status, whether treatment was necessary, and whether there was a risk that mother could experience a similar event in future. The court reasonably concluded that mother had not effectively addressed her own mental-health needs as required by the case plan, which had significantly impeded her progress toward reunification. These findings supported its conclusion that stagnation had occurred.

Mother also claims that the court erred in refusing to allow A.M. to testify. We conclude that mother failed to preserve this argument by raising it below. See In re A.M., 2015 VT 109,

---

[2] Although mother suggests that the court was precluded from considering events that took place after DCF filed the petition to terminate parental rights, our case law makes clear that the trial court must examine the totality of the facts presented at the termination hearing. See, e.g., In re T.M., 2016 VT 23, ¶ 14, 201 Vt. 358 (explaining that in reviewing stagnation determination, this Court examines all evidence offered at final termination hearing).

¶ 28, 200 Vt. 189 (explaining that to properly preserve argument for appeal, party "must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule" (quotation omitted)). Prior to the termination hearing, mother moved to exclude hearsay evidence about where A.M. wanted to live, and A.M.'s attorney and guardian ad litem moved to allow A.M. to testify about his position on the petition. During the first day of the hearing, the court denied mother's motion and deferred ruling on the motion to allow A.M. to testify. Mother subsequently obtained new counsel, and at the July 2024 hearing on DCF's motion for a protective order, counsel indicated that mother opposed allowing A.M. to testify. The court gave counsel an opportunity to file a written response to the motion but he did not do so. The court subsequently denied the motion, concluding that the information was available from other sources and that calling A.M. to testify could be detrimental to him. It indicated that the motion could be renewed if A.M.'s testimony was necessary for a specific purpose. Mother never asked that A.M. be allowed to testify. Under these circumstances, we conclude that she waived her right to raise this argument on appeal. Id.; see also State v. Morse, 2019 VT 58, ¶ 7, 211 Vt. 130 (explaining that party who invites error waives or intentionally relinquishes right to challenge it on appeal).

Finally, mother claims that the court erred in concluding that she would not be able to resume parenting within a reasonable time. We see no error. The court's conclusion is supported by its findings. Mother had not been able to demonstrate adequate progress in addressing her mental health, dealing with stressful situations without becoming dysregulated, or communicating effectively with DCF or A.M.'s providers, despite having over four years to do so, and it was not clear how long it would take for mother to demonstrate an ability to safely care for A.M. on a full-time basis. Her relationship with A.M., although loving, had significantly deteriorated because of her behaviors. These findings, coupled with A.M.'s need for permanency, supported its conclusion on this factor, and in turn support its conclusion that termination of mother's parental rights was warranted.

Affirmed.


BY THE COURT:


_____
Paul L. Reiber, Chief Justice


_____
William D. Cohen, Associate Justice


_____
Nancy J. Waples, Associate Justice


5